Milton R. **DUSKY**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 16607.

United States Court of Appeals Eighth Circuit.

Nov. 3, 1961.

---

James W. Benjamin, Kansas City, Mo., on brief, for appellant.

Edward L. Scheufler, U. S. Atty., and J. Whitfield Moody, Asst. U. S. Atty., Kansas City, Mo., on brief, for appellee.

Before VOGEL and BLACKMUN, Circuit Judges, and BECK, District Judge.

BLACKMUN, Circuit Judge.

This in forma pauperis criminal case, before us for the second time after the defendant's conviction upon a plea of not guilty and a defense of insanity, now poses a precise but narrow and naked issue: With "some proof" bearing on insanity of the defendant having been introduced, Davis v. United States, 1895, 160 U.S. 469, 488, 16 S.Ct. 353, 40 L.Ed. 499, was the evidence as a whole sufficient to justify the jury's conclusion, as a necessary factor in the conviction, that the defendant was legally sane at the time of the offense, or, in alternate words, did the government sustain its burden on the sanity issue?

Because of the case's nature, because of the apparent sensitiveness in these days of the issue involved, and because the case already has once been in the Supreme Court of the United States, we review its history and its facts in detail:

*The history of the case.* The defendant, Milton Richard Dusky, then 33 years

of age, was charged by an indictment filed September 10, 1958, with having unlawfully transported and caused to be transported, in interstate commerce from Johnson County, Kansas, to Ruskin Heights, Missouri, on or about August 19, 1958, a certain girl who had been unlawfully kidnapped and carried away and not liberated unharmed, all in violation of 18 U.S.C. § 1201. When the defendant was unable to employ counsel, the district court appointed Mr. James W. Benjamin of the Bar of Kansas City, Missouri, to represent him.[1]

At arraignment a plea of not guilty was entered. Upon the defense's suggestion that there might be some question as to the defendant's competency to stand trial, the district court, on its own motion and pursuant to 18 U.S.C. § 4244, committed the defendant to the United States Medical Center for Federal Prisoners at Springfield, Missouri, for examination. The ensuing psychiatric reports indicated mental illness with a diagnosis of schizophrenia. As a result the court (The Honorable R. Jasper Smith) held the hearing required by § 4244. The evidence presented at that hearing is set forth in detail by Judge Sanborn in this court's first opinion in this case. Dusky v. United States, 8 Cir., 1959, 271 F.2d 385, 387–389. Judge Smith concluded that the defendant then had sufficient mental competency to stand trial.

The first trial took place in March 1959. The principal defense was insanity.[2] The evidence at that trial, including the defendant's own testimony, is also reviewed at length in this court's first opinion, pages 390–394 of 271 F.2d. The trial resulted in a judgment of conviction and a 45 year sentence.

On the defendant's first in forma pauperis appeal here error was asserted, among other things, as to the trial court's finding that the defendant was competent to stand trial, as to its submission to the jury, over the motion for judgment of acquittal, of the issue of insanity at the time of the alleged crime, and as to the court's instructions on that issue. This court held (1) that under 18 U.S. C. § 4244, the duty and responsibility of determining competency to stand trial is that of the trial court; (2) that the court's "determination in that regard cannot be set aside on review unless clearly arbitrary or unwarranted"; (3) that the question of such competency is one of fact for the court; (4) that expert opinion rises no higher than the reasons upon which it is based and is not binding upon the trier of fact; (5) that the court did not err in requiring the defendant to go to trial despite the then contrary opinion of the psychiatric staff of the Medical Center; (6) that "the evidence unquestionably was sufficient to place the burden of proving the defendant's sanity upon the Government"; (7) that under the evidence the sanity defense issue was one of fact for the jury; (8) that the court did not err in refusing to grant the motion for judgment of acquittal; (9) that the court did not err in refusing to instruct the jury on the basis of the test of insanity enunciated by the Court of Appeals of the District of Columbia in Durham v. United States, 1954, 94 U.S. App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430; (10) that instructions embracing the "right and wrong" test of insanity which issued from M'Naghten's Case, 1843, 10 Cl. & Fin. 200, 8 Eng.Rep. 718, were not improper, and (11) that "it was for the jury to decide whether, under the evidence, there was a reasonable doubt as to the defendant's sanity at the time the offense was committed". The conviction was therefore affirmed. The panel of this court sitting on that appeal (including none of us constituting the present

---

1. Mr. Benjamin has continued to act in this capacity at both trials and on both appeals. His service to the defendant has been of the highest caliber and has been performed without fee and at his own expense. This court is grateful for Mr. Benjamin's efforts and assistance.

2. This court observed, page 391 of 271 F.2d: "Under the evidence of the Government, no other defense would seem to have been available to the defendant."

panel) concluded its opinion with the following observation, pages 401–402 of 271 F.2d:

"The questions raised are not entirely free from doubt. Our views as to the test of insanity and as to when a defendant who asserts that defense is entitled to a directed verdict do not conform with the more recent views of the Court of Appeals of the District of Columbia Circuit. It would, no doubt, be helpful if the Supreme Court would grant certiorari in this or some similar case and clarify the law relating to the test of insanity, the quantum of evidence required to meet the burden of proof of sanity, and other aspects of the problem."

An ensuing petition for certiorari was indeed filed. The then Solicitor General, however, represented to the Supreme Court that "the record in this case does not sufficiently support the findings of competency to stand trial" and that the trial court, in order to support those findings under § 4244, "would need more information than this record presents." The Supreme Court agreed with these and other suggestions of the Solicitor General, granted the petition, reversed our judgment and remanded the case to the district court "for a new hearing to ascertain petitioner's present competency to stand trial, and for a new trial if petitioner is found competent". Dusky v. United States, 1960, 362 U.S. 402, 403, 80 S.Ct. 788, 4 L.Ed.2d 824.

The present appeal is the culmination of that reversal and remand. The required new hearing to ascertain the defendant's competency to stand trial was held October 3, 1960, this time before the Honorable Albert A. Ridge, then Chief Judge of the United States District Court for the Western District of Missouri. Dr. John Kendall Dickinson, a staff psychiatrist at the Springfield Medical Center, whose testimony at the subsequent trial is hereinafter described, and Dr. Joseph C. Sturgell, chief of the psychiatric staff there, both testified at that hearing. Their testimony and the June 1960 written report of the Center's staff were to the effect, specifically, that the defendant was then oriented as to time, place and person; that he had some recollection of the events surrounding the offense with which he was charged; that he had present ability to consult with his lawyer with a reasonable degree of rational understanding; that he had a rational as well as a factual understanding of the proceedings in court against him; and that, generally, he was competent to stand trial. Defense counsel expressed his confidence in the psychiatrists and acknowledged to the court that he was not then experiencing the difficulty in consulting and working with his client which he had encountered at the time of the first trial. It will be noted that the evidence produced at this hearing was along the exact lines of the test set forth by the Supreme Court at page 402 of 362 U.S., 80 S.Ct. 788, 4 L.Ed. 824. Judge Ridge accordingly found that the defendant was competent to stand trial.

Re-arraignment followed immediately, a plea of not guilty was again entered, and the new trial took place on October 4 and 5, 1960. The court's instructions to the jury embraced the right and wrong test of M'Naghten and the added requirement that the defendant "knowingly, wilfully and feloniously intended so to do and so act in the premises at the time in question". The defendant was again found guilty. This time the sentence imposed was for 20 years with the provision, pursuant to 18 U.S.C. § 4208(a) (1), that the defendant shall become eligible for parole upon the expiration of 5 years.

In contradistinction to the first appeal, the defense now makes no complaint of the trial court's conclusion that the defendant was competent to stand trial. Thus the issue upon which the Supreme Court's reversal was based is not now before us. We are concerned only with the other original major issue, namely, that of the defendant's sanity at the time of the alleged offense. This is the issue which the Supreme Court did not reach when it first took this case and which

was the subject of this court's concluding observation, quoted above, in the first opinion.

*The facts.* While the parties generally characterize the evidence presented at the two trials as the same, there were some differences. The defendant did not take the stand at the second trial. A statement signed by the defendant under circumstances which allegedly raised the issue of Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479, was not presented this time by the government. And on the second trial Dr. Dickinson, called by the defense, was the only physician who testified. Because the trial, of course, was a new one and because the nature and extent of the evidence constitutes the primary issue now before us, we shall not refer to the evidence outlined in the first opinion but shall, instead, describe and be concerned with only what came forth at the second trial.

There continues to be no dispute as to the factual events of August 19, 1958, giving rise to the indictment. The female victim, then a high school student 15 years old, lived with her parents in Ruskin Heights, a suburb of Kansas City, Missouri. About noon on August 19 she was walking to a neighborhood drug store to have lunch with another girl. The defendant, with two boys, Leonard Dischart, age 14, and Richard H. Nixon, age 16, drove by in the defendant's automobile and offered her a ride to the drug store. She had met Nixon before and knew Dischart casually and accepted the invitation; she had not known the defendant. They left her at the store. The defendant and the two boys then went on to the nearby Wheel Inn Drive In. There they drank vodka supplied by the defendant and discussed the girl and "what kind of a girl she was" and whether they could have sexual relations with her. They returned to the drug store and waited for her. They met her as she came out and offered to drive her home. She refused but they asked again as she started to walk up the highway. This time she accepted. They did not take her home but first pretended to be going to another girl's house, which they passed, and then drove over into Kansas. The defendant was driving at first but after they had passed the other girl's home the defendant gave Dischart the wheel. They stopped on a back road. There, with a small knife displayed, the two boys raped her. The defendant also attempted to have intercourse with her but was unsuccessful. Dusky then drove them all back to Ruskin Heights. They stopped at the Wheel Inn Drive In. The girl had worked there before and was permitted to leave the car when she asked to get out in order to get a drink of water. She ran into the place and told one of the men with whom she had worked that she had been attacked.

The F.B.I. agent who participated in the arrest of the defendant and Dischart the evening of August 20, 1958, testified that warrants had been issued for their arrest; that he told the defendant he had a federal warrant for him on the charge of kidnapping; that the defendant then said, "That is a pretty serious crime, isn't it?"; that Dusky inquired as to what the charge referred to; that the agent told him that "It refers to the incident where you all picked up that girl out in Ruskin Heights the day before"; and that the defendant then said, "That wasn't kidnapping, she got in the car voluntarily". This concluded the government's case in chief.

*The qualifications of the sole medical witness.* The defense then called Dr. Dickinson as its medical witness. He testified that he graduated from the University of Illinois Medical School in 1957 and took his internship at St. Francis Hospital in Evanston. Following this he was licensed to practice medicine in Illinois. He stated that he had been "exclusively practicing psychiatry for slightly over two years in the Medical Center". On cross-examination, however, he testified that he arrived at the Medical Center only on August 19, 1958, the very date of the crime alleged here; that he had no earlier psychiatric experience other than that which he obtained in medical

school; and that the defendant was one of his first patients at the Medical Center.[3]

*The physician's testimony.* Dr. Dickinson testified that the defendant at the Medical Center was under his constant personal care as ward psychiatrist from about October 3, 1958, to the time of trial. He said that his history disclosed that the defendant "was the product of a disorganized home situation"; that his father was an alcoholic and his mother was described as a loose woman; that "there was a great deal of discord in the home"; that his sister assumed the maternal role and became domineering; that his parents separated and defendant was left at age 15 to shift for himself in Kansas City; that he then quit school and went to work "with moderate success"; that he was married by age 17 and enlisted in the Navy; that after a short period in the Navy he developed somatic complaints; that after 11 months he was examined by a Navy psychiatrist and found "to be suffering from a mental illness"; that he was discharged from the Navy because of this illness; that he rejoined his wife and resumed work but was beset by "unreal feelings, feelings of impending doom * * * and more or less in general presented the picture of a person who was mentally ill, even though he was in a relatively * * * fair way to make his living by working"; that he was employed for several years by Goodyear Tire, and from 1949 to 1956 by Porter Electric Company; that his mother died in 1953 and "he began to deteriorate at that time, grow worse"; that he began to drink excessively and to have feelings of persecution; that his work also deteriorated and he was relieved in his work by a friend and finally quit in 1956; that then "there began a long, rather continuous history of appearances at the Veterans Administration hospitals, the Kansas City Psychiatric Receiving Center, and other such organizations"; that at the Kansas City Veterans Administration Hospital in July 1956 he received a diagnosis of rectal difficulties and mental illness; that he made a "suicide gesture" in 1956; that he was seen at the Psychiatric Receiving Center in December 1956 and in January and June 1957; that he was a psychiatric patient at the Topeka Veterans Administration Hospital from June 17 to July 26, 1957, when he left against medical advice; that the records there show he gave evidence of emotional lability; that he was aware of his inadequacies and of his dependency on his wife and of his hatred

---

3. "Q. Doctor, how long have you been at the Medical Center? When did you arrive there? A. Arrived on August 19, 1958.

"Q. And what was your psychiatric experience prior to that time? A. My psychiatric experience prior to that time began in 1953, when I entered medical school, and from that time onward through medical school.

"Q. Now just a minute. What experience in the study and practice of psychiatry did you have in medical school that other medical doctors didn't have? A. Probably a little bit more in that the University of Illinois is quite highly oriented to psychiatry. They begin in the freshman year in courses of psychiatry, we go through the sophomore year, have actually extensive, I think more extensive clinical experience in the junior and senior years.

"Q. Then after you finished medical school you served an internship? A. That is correct, yes.

"Q. Where was that? A. That was at St. Francis Hospital at Evanston, Illinois.

"Q. Is that a mental hospital? A. No, a general hospital.

"Q. You served a medical internship such as other medical doctors do? A. That is correct, yes.

"Q. And from there you went to the Medical Center? A. The Medical Center.

"Q. And this gentleman here, Mr. Dusky, would have been one of your earliest patients, so to speak, in psychiatry? A. Well, I had quite a few patients in medical school as well. But at the Medical Center, yes, this would have been one of my first patients at the Medical Center, approximately.

"Q. And you have taken quite an interest, of course, in him? A. Yes. His case has been quite interesting."

for her; that the doctors at that time felt he was suffering from a severe chronic anxiety reaction with poor prognosis; that upon his release he continued to drink heavily; that he returned to the Psychiatric Receiving Center in December 1957; that his wife left him early in 1958; that he entered the Topeka Hospital again on March 21, 1958, and received essentially the same diagnosis; that he left 7 days later against medical advice; that shortly prior to this hospitalization he "became unable to on occasion separate reality from his own fantasy experiences"; that he felt he was other people and, in particular, Jesse James; that people's faces would change and appear different than they actually were; that in 1958 he made another suicide attempt when he was at his uncle's; that his uncle was not sympathetic and merely told him that "if he wanted to commit suicide to go someplace else and do it"; that in July 1958 his son told him that Dusky's brother was going to marry Dusky's wife; that at this point his "feelings of unreality grew worse"; that he then ascertained that his wife and his brother were actually married; that he suffered hallucinations; that he was consuming large quantities of liquor at this time; that this drinking was an escape mechanism in connection with his mental disorder; that "he began to see visions"; that in illnesses of his kind "there is a tendency to engage in magical thinking", that is, "that the person thinks of something, and because he thinks of it, he actually believes that it has occurred"; that "the people in Dusky's position frequently do not appreciate the qualities of the acts in which they are involved"; that "his thinking became quite what we call loose"; and that he was suffering from delusions of persecution.

Dr. Dickinson took this history material primarily from medical records. He went on to testify that psychological tests were given the defendant in the fall of 1958 at the Medical Center; that these were performed by the psychologist there and "showed a severe amount of personality disorganization"; that the psychologist noted that "he suffered a severe loss in personality strength in the capacity to master conflict situations * * * and to meet the demands of what we know as reality, that is average day-to-day living"; that under stress such a person can retreat from reality without great traumatic experience; that several days prior to August 19, the landlady where Dusky had been staying asked him to leave because one or two of his sons, who were living with him, had invited friends over and "had done such things as broken the television set and let the landlady's dog out of the house and the dog subsequently got run over and was killed"; that the defendant was diagnosed at the Medical Center as suffering from schizophrenia; that this is a very severe form of progressive mental illness which may bring delusions of persecution, hallucinations, feelings of unreality, "and a host of other symptoms"; that schizophrenia is a psychosis and "a psychosis is the more severe form of mental illness"; that he did not know whether this could be called insanity in lay terms; that Dusky's progress, however, was excellent under the treatment he had at the Center; that Dusky had been able to relate the various details of what had happened on August 19; that this ability to remember, however, does not mean that the person is not sick; that a person can be sick and remember such details; that in the doctor's opinion Dusky was suffering from schizophrenia on August 19, 1958; and that "my opinion * * * would indicate to me that so far as a reasonable medical probability and statement concerning that probability can be made" Dusky was "unable to appreciate the quality of his acts and was unable to tell the difference between right and wrong at that time".

On cross-examination the witness corrected this last conclusion to the extent that it was his opinion that he probably did not know the difference between right and wrong but that it was possible that he knew this difference "but I think that he probably didn't"; that in the year

before August 19, 1958, "there is a strong probability that at some time he knew the difference between right and wrong"; that as of now he was quite sure he knew that difference; that the severity of the illness fluctuates and affects a man's ability to know right from wrong; that the physicians were not able to demonstrate any actual organic damage to the brain or other parts of the nervous system of the defendant and thus there was nothing organically wrong with him which caused his mental illness; that it was true that his difficulties in the Navy reached their peak when he had finished boot training and was preparing to leave for sea duty; that the indictment was a serious threat to him; that in ascertaining his condition on a specific day one had to rely primarily on what the defendant told him; that Dusky gave the impression of being approximately of average intelligence; that on admission to the Medical Center he was approximately oriented as to time, place and person; that his I.Q. was about average; that "when questioned about ordinary things he would talk apparently fairly rationally and coherently"; that there are many types of mental illness which do not affect a person's ability to distinguish between right and wrong; that there are even degrees of schizophrenia which do not affect one's ability to tell right from wrong; that during the years before "his significant breakdown" his attitude "toward women and his treatment of them was quite unsavory, because of the strong conflicts due to mother figures"; that he harbored resentment toward women in general; and that in each instance when Dusky was in the Veterans Administration Hospital "they rated him as competent".

On re-direct, Dr. Dickinson stated that Dusky's learning that his wife had actually divorced him and married his brother was "the turning point" and that from then on "I would be within the realm of medical probability, I am sure, that he didn't know the difference between right and wrong"; that this took place sometime between March and July, 1958; that his problems with women were now no longer existent; and that the word "competent", which appeared in the Veterans Administration files, was directed toward his ability to receive his disability compensation checks himself and had no specific connection with whether he knew the difference between right and wrong.

On recross he admitted that if a patient did not know right from wrong he would feel that the Veterans Administration "would not consider him able to receive the check himself", and that a rating of competency in March 1958 indicated that the Veterans Administration concluded he knew right from wrong at that time.

In response to inquiries from the court, Dr. Dickinson stated that schizophrenia can have varying levels of severity; that as to Dusky's type of schizophrenia "the degree was severe"; that at the present he was in "good remission, which means that he has recovered from his illness to a large degree"; that after leaving the Topeka Veterans Hospital in March 1958 until he received information about his wife's marriage in the following July, the degree of severity "was moderate"; that a person with a moderate degree of schizophrenia could either know or not know the difference between right and wrong; and that in Dusky's case "there was about a 50-50 chance" as to this.

*Other defense witnesses.* There was some lay evidence presented by the defense. F. W. Porter, an electrical contractor for whom Dusky worked from 1947 to February 1956 and again for 4 days in December 1957, testified that "I would say there was a nervous condition of some description existed"; that he asked Dusky to return to work in 1957; that he worked for the few days and then "just quit, he said he was too nervous to work"; and that he was not "real close to him, but I thought there was something wrong with him, different than I had observed from previous years". Another witness, a next-door neighbor of "many years ago", testified that Dusky

was a good boy in his childhood; that his father drank a lot and the police had to be called at times because of this; that Dusky worked for him for a while after World War II; and that he was then "very nervous and not competent, incompetent, and we had to discharge him for that reason". A former electrical union representative testified that in July 1958 Dusky came to him about employment; that he sent him out on an assignment; that he told him "he was going to have to straighten himself out, because we had had complaints about his being irresponsible, not showing for work, and I had had a lot of trouble with him in violation of our by-laws and working conditions"; that he was able to place him; that "I knew there was something definitely wrong and I told him he was either going to have to straighten himself out, that this was the last chance I was giving him, and that if he didn't, not to come back there for any more employment, because we just couldn't tolerate the trouble that we were going through to try to place him." The wife of Dusky's uncle testified that the defendant's mother and father had difficulties; that in the summer of 1958 Dusky started to visit the witness and her husband; that he came out about August 19; that she was then just leaving on an errand and suggested that he come back later or wait; that he was not there when she returned; and that at the time "he looked very, very dejected, very unhappy".

*Rebuttal.* The government's rebuttal consisted of the testimony of one witness. This witness was Dischart's mother. She testified that she first met Dusky the night of the arrest on the porch of her home in Kansas City, Missouri, and that she and her son and Dusky were talking on the porch before the arrest "concerning this girl". Her direct examination went on as follows:

"Q. Did you have some conversation about this difficulty with your son, after they advised you of the difficulty, did you have some conversation with your son about it? A.

Yes, me and my son was talking about the thing and Mr. Dusky broke into the conversation.

"Q. And what did Mr. Dusky say at that time? A. Well, we had been talking for some time and they started being not so scared and he started saying if he got caught what he would do.

\* \* \* \* \* \*

"Q. Now, what did Mr. Dusky tell you concerning this matter? A. Well, when I was bawling out my son about such a thing that they had done, he says, 'not to blame him too much about it ma'am', he says, 'he is not at fault, I am.'

"Q. Did he give any reason why he considered himself to be at fault? A. No, he didn't say which part he was at fault.

"Q. Did he give any reason for just why he was at fault in this matter? A. Because he was an older man, he says, 'I am an older man', and he said they had been drinking was why all this had happened.

"Q. What statement did he make about their drinking, if you recall? A. He said all that wouldn't have happened if they hadn't been under the influence of liquor.

"Q. Now, what other conversation did Mr. Dusky have with you concerning his involvement in this offense and his efforts to escape therefrom, if any? A. Well, then they was discussing what he and my son was going to do about all this and he said if he got caught he would make like he wasn't well.

"Q. Who said that? A. Mr. Dusky.

"Q. He said if he got caught he would make like he wasn't well? A. Yes.

"Q. What further conversation did you have with him? A. He said he was pensioned off, I think he said it was a Section 8, and he was still pensioned off by the government

and he thought he had a good chance of pulling it through with that backing him up.

"Q. Pulling what through? A. With a discharge and he said he had been put away once before.

"Q. Did he ask you for any advice or give you any indication of his intention in this regard? A. Yes, he was asking my advice, what I thought of it.

"Q. And what did he say when he would ask you that? A. He said, 'Well, what do you think, if I would do something like that and my pension and being put away before, do you think they would believe me?' and things like that.

"Q. What was his condition at this time? How did he act? A. Well, by that time he was O.K., he was quite nervous and scared when he first came and by that time he could carry on a conversation pretty well.

"Q. What conversation did you have concerning your knowledge of his plans of that kind? A. You mean what I would say to what he would ask me?

"Q. Yes, after he would ask you about this what would you reply? A. Well, I told him that I did have a friend and her husband was discharged at one time with that kind of discharge that he had, and everybody knowed him as being crazy and it wasn't hard to pull it, you know, which her husband had pulled the same thing in the Army to get out and then everybody just called him crazy after that. That seemed to have given him some confidence at the time.

"Q. After that time did he become more composed? A. Yes. Then they just started planning what else they were going to do after that, if they didn't get caught.

"Q. Did he appear to be concerned about the matter? A. Well, he was very scared there for a while.

He said, 'I know if they catch me they are going to put me in jail for life or I will get the electric chair.' He said, 'After all, I am the older man, much older. Your boy, he will get away from it because he is a young man.'

"Q. Did he make any statements to you concerning how he would effect this condition which he had described to you and what the result would be insofar as his detention and one thing another would be? A. Well, if I understand you right, he said that he would make like he wasn't right if they arrested him, if he would get caught, and then I said, 'How would you gain anything by that? It wouldn't be no better than being in prison, you would still be locked up.' He said, 'Oh, no, it is not that bad, you get to act right after a while and they trust you and it gets to be like a home, and then if you get well enough they put you in a better place where you are too well to be with the others and when you get well you are free, and you don't get tried for something you have done when you are not well.' "

At the close of the evidence the defendant moved for judgment of acquittal on the grounds that "the evidence is insufficient to sustain a conviction of the offense of kidnapping, as charged in the indictment, and more particularly there is no probative evidence of the defendant's sanity at the time of the alleged offense when the evidence shows that he was mentally ill and insane". This motion was denied. As has been noted, the court in its instructions defined insanity in line with the "right and wrong" standard of M'Naghten plus the requirement of felonious intent; the court also stated that the government was not required to prove that the defendant was not mentally ill in any degree at the time of the alleged offense. The record discloses no objection to these instructions.

After the verdict the defense made a motion for judgment of acquittal notwithstanding the verdict and rested this

motion on the same grounds of lack of substantial or probative evidence to support the verdict and "because all of the competent evidence in regard to the issue of the defendant's sanity at the time of the alleged offense showed the defendant to be then insane and incapable of knowing the difference between right and wrong, and the Government presented no substantial evidence to sustain its burden of proving that the defendant was sane at the time of the alleged offense." This motion was also denied.

So much for the evidence. Before commenting upon it, we note and emphasize, admittedly with some repetition, that upon this record and this appeal:

(1) We are not confronted with any question of the defendant's competency to stand trial.

(2) There is no dispute as to the actual events of August 19, 1958, or as to the sufficiency of the proof of facts comprising an offense under 18 U.S.C. § 1201.

(3) No question is raised as to the propriety of the trial court's charge to the jury and, in particular, as to the propriety of its use of the M'Naghten test plus felonious intent.[4]

Therefore, as the defense states in its present brief, "In an attempt to obtain a review by the Supreme Court, if necessary, * * * this appeal is limited to the error of the trial court in overruling the motion for judgment of acquittal or directed verdict (and in overruling the subsequent post-trial motion for judgment notwithstanding the verdict) on the ground that the Government failed to produce substantial competent evidence to sustain its burden of proving sanity". The government is obviously in accord with this conclusion as to the narrowness of the issue on appeal.

The defense's position here, consistent with the motions below, is that the government has failed to produce any substantial probative evidence of the defendant's sanity at the time of the offense; that a conclusion that the government has produced evidence sufficient to go to the jury would be in conflict with views recently expressed by the Courts of Appeals of the Sixth, Tenth, and District of Columbia Circuits; and that a mere possibility of sanity of the defendant does not constitute substantial evidence. Specifically, the defense stresses that "not one single psychiatric expert was produced by the government to sustain its burden of proof and submissibility".

The government's position is that the nature and quantum of evidence of sanity which it must produce to take the issue to the jury will vary from case to case; that the lay witnesses presented by the defense did not testify as to sanity and were not qualified so to do; that the defense's psychiatric evidence consisted only of the inconclusive testimony of Dr. Dickinson, a witness of limited psychiatric background; that the evidence of insanity of the defendant was no more than slight; that the government's rebuttal evidence showed a plan to feign a mental illness; that the defense evidence of insanity was less and the prosecution evidence of sanity was greater than at the first trial; that the cases relied upon by the defense are clearly distinguishable; and that the issue was definitely one for the jury.

There are some general considerations which deserve notice at this point:

1. The law, to this date at least, "assumes the freedom of the will as a working hypothesis in the solution

---

4. This, presumably, is because of our refusal to disapprove on the first appeal, pages 394 and 401 of 271 F.2d, and in Voss v. United States, 8 Cir., 1958, 259 F.2d 699, 702–703, instructions based on M'Naghten, and of our observations in those cases that the Supreme Court has thus far approved the use of such a test. Davis v. United States, supra, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499; Davis v. United States, 1897, 165 U.S. 373, 378, 17 S.Ct. 360, 41 L.Ed. 750; Hotema v. United States, 1902, 186 U.S. 413, 420–421, 22 S.Ct. 895, 46 L.Ed. 1225. See Matheson v. United States, 1913, 227 U.S. 540, 543, 33 S.Ct. 355, 57 L.Ed. 631; Fisher v. United States, 1946, 328 U.S. 463, 467, 66 S.Ct. 1318, 90 L.Ed. 1382; and Leland v. State of Oregon, 1952, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302.

of its problems" [5] and also assumes "that mature and rational persons are in control of their own conduct".[6] It has been aptly said that "In the determination of guilt age old conceptions of individual moral responsibility cannot be abandoned without creating a laxity of enforcement that undermines the whole administration of criminal law".[7] And

"The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil". Morissette v. United States, 342 U.S. 246, 250, 72 S.Ct. 240, 243, 96 L.Ed. 288.

■■ 2. The law consequently indulges in the presumption in favor of a defendant's sanity. That presumption, however, is rebuttable. The defendant's sanity may be brought into issue. Once it is in issue, the prosecution, in the federal courts, at least, must establish sanity beyond a reasonable doubt just as it must prove every other element in its case. This is the holding of Davis v. United States, supra, pages 486 and 488 of 160 U.S., 16 S.Ct. 353, 40 L.Ed. 499, decided over 65 years ago. It has been adhered to by the Supreme Court and, of course, has been recognized by various federal Courts of Appeals. See, for example, Davis v. United States, 1897, 165 U.S. 373, 378, 17 S.Ct. 360, 41 L.Ed. 750; Hotema v. United States, 1902, 186 U.S. 413, 420–421, 22 S.Ct. 895, 46 L.Ed. 1225; Matheson v. United States, 1913, 227 U.S. 540, 543, 33 S.Ct. 355, 57 L.Ed. 631; Leland v. State of Oregon, 1952, 343 U.S. 790, 797, 72 S.Ct. 1002, 96 L.Ed. 1302; Isaac v. United States, 1960, 109 U.S.App. D.C. 34, 284 F.2d 168, 169–170; United States v. Currens, 3 Cir., 1961, 290 F.2d 751, 761; Pollard v. United States, 6 Cir., 1960, 282 F.2d 450, 457; United States v. Westerhausen, 7 Cir., 1960, 283 F.2d 844, 851–852; Fitts v. United States, 10 Cir., 1960, 284 F.2d 108, 112.

■■ 3. This and other courts have said that expert opinion as to insanity rises no higher than the reasons upon which it is based, that it is not binding upon the trier of the facts, and that lay testimony can be sufficient to satisfy the prosecution's burden even though there is expert testimony to the contrary. Dusky v. United States, 8 Cir., supra, p. 397 of 271 F.2d; Holloway v. United States, 1945, 80 U.S.App.D.C. 3, 148 F.2d 665, 667, certiorari denied 334 U.S. 852, 68 S. Ct. 1507, 92 L.Ed. 1774; McKenzie v. United States, 10 Cir., 1959, 266 F.2d 524, 527; Hall v. United States, 4 Cir., 1961, 295 F.2d 26; United States v. Fielding, D.C.D.C., 1957, 148 F.Supp. 46, 55 (reversed 1957, 102 U.S.App.D.C. 167, 251 F.2d 878, without recognition of the point except by the dissenting judge, page 881); Hopkins v. United States, 1959, 107 U.S.App.D.C. 126, 275 F.2d 155, 158. See U. S. v. Spaulding, 1935, 293 U.S. 498, 506, 55 S.Ct. 273, 79 L.Ed. 617.

■ 4. It has been said, too, that the nature and quantum of the evidence which the government must produce to meet its burden so as to justify the submission of the insanity issue to the jury varies with the nature and quantum of the evidence indicating mental illness. Thus, it would seem that only slight evidence presented by the defense may be met by a comparatively small amount of evidence presented by the prosecution. Wright v. United States, 1957, 102 U.S. App.D.C. 36, 250 F.2d 4, 7; Hopkins v. United States, 107 U.S.App.D.C. 126,

---

5. Mr. Justice Cardozo in Steward Machine Co. v. Davis, 1937, 301 U.S. 548, 590, 57 S.Ct. 883, 892, 81 L.Ed. 1279.

6. Mr. Justice Jackson in Gregg Cartage & Storage Co. v. U. S., 1942, 316 U.S. 74, 80, 62 S.Ct. 932, 935, 86 L.Ed. 1283.

7. Judge Thurman W. Arnold in Fisher v. United States, 1945, 80 U.S.App.D.C. 96, 149 F.2d 28, 29, affirmed 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382.

supra, at page 157 of 275 F.2d; United States v. Westerhausen, supra, 7 Cir., at page 852 of 283 F.2d. See Battle v. United States, 1908, 209 U.S. 36, 38, 28 S.Ct. 422, 52 L.Ed. 670.

5. It has also been observed, with respect to the raising of the issue of a defendant's insanity, that "any attempt to formulate a quantitative measure of the amount of evidence necessary to raise (the) issue can produce no more than an illusory definiteness". Tatum v. United States, 1951, 88 U.S.App.D.C. 386, 190 F.2d 612, 615; Fitts v. United States, supra, 10 Cir., at pages 112–113 of 284 F.2d; United States v. Currens, supra, 3 Cir., at page 761 of 290 F.2d.

■ We need not here entangle ourselves in the possibly troublesome question of the quantitative measure of what the Supreme Court in the first Davis case referred to as "some proof" of insanity, for we conclude on the record before us, as this court did in the first Dusky opinion, at page 398 of 271 F.2d, that "the evidence unquestionably was sufficient to place the burden of proving the defendant's sanity upon the Government". Compare Hall v. United States, Fitts v. United States and United States v. Currens, all supra.

We may proceed, then, to the question which here is basic, namely, whether the evidence was sufficient to take the sanity issue to the jury.

■ Because we are subject to the natural and ever present judicial desire for absolute certainty, we might wish as always that the evidence consisted entirely of positive blacks and whites and was not flecked with some greys. Nevertheless, we conclude that the evidence in this case, viewed fairly and as a whole, afforded permissible choices for the jury and that, therefore, the submission of the insanity issue to the jury was proper.

On the part of the defense we have lay evidence which was necessarily general in nature, and, in addition, the testimony of a single professional man, then an obviously fledgling psychiatrist, who had come to the Medical Center just before the defendant's admission there, who possessed no prior special training or experience in the field, who up to that time had been subjected, so far as psychiatry is concerned, only to the general psychiatric material given to all students in the undergraduate medical school of the University of Illinois, and whose real psychiatric training, if it is to be called such, began only upon his assignment to Springfield and his 2 years there immediately prior to the trial. When he went to the Center he had just received his license to practice medicine. While perhaps he was the physician most involved in the care of the defendant, while his testimony was admissible, and while it purported to express staff opinion as to the diagnosis of schizophrenia, it was not the testimony of a long practicing or specially trained or board certified psychiatrist of broad experience. And so far as the opinion of Dusky's inability to appreciate the quality of his acts and to distinguish between right and wrong on August 19, 1958, is concerned, that opinion on this record was not staff opinion but was solely that of this comparatively inexperienced physician alone and was one which rested on probability, which admitted the possibility of the contrary being true, and which clearly acknowledged attainment by the defendant of right and wrong judgment during the year preceding the offense.[8]

On the side of the prosecution we have the testimony of Mrs. Wade, mother of one of the under-age participants. Her testimony consisted of comments which

8. We recall that only a little over 5 years ago the Supreme Court said:

"The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment, even about a situation as unpromising as petitioner's, at least as indicated by the report of the United States Medical Center at Springfield." Greenwood v. United States, 1956, 350 U.S. 366, 375, 76 S.Ct. 410, 415, 100 L.Ed. 412.

she said the defendant made to her by way of anticipated solution of the difficulties then closing in about him.

Dr. Dickinson's testimony as to the defendant's ability to meet the right and wrong standard was not, as he showed, categorical. Mrs. Wade's testimony, if accepted and believed, evinced an awareness in the defendant of his predicament, of the quality of his act, of the need of extricating himself, of how best to do it, and of the realities of the situation. That testimony did show that he knew enough to advise Dischart's mother that she should not blame her son; that he, Dusky, was at fault and not her boy; that he was aware that they had been drinking; that the event would not have taken place had they not been under the influence of liquor; that if he, Dusky, were caught, he would "make like he wasn't well"; and that if he were put away he would ultimately be set free.

But Mrs. Wade's testimony does not stand alone. There are other factors: (1) the defendant's participation with Dischart and Nixon in the conversation before the offense as to what they could accomplish with the girl; (2) his curiosity and inquiry at that time as to what kind of a girl she was; (3) his being the source of supply of the vodka; (4) his driving the car initially and until after they had passed the home of the other girl they said they were going to visit; (5) his turning the wheel over to Dischart; (6) his telling the victim, when the car had stopped in Kansas and Dischart and Nixon had stepped out and gone around to the back, that she "might as well take it in (her) stride because (she) knew what was going to happen"; (7) his driving the car back from Kansas to Missouri; (8) his immediate awareness of the seriousness of the charge when the arresting officer advised him of his possession of a warrant, and (9) his equally immediate reaction by way of effort to tone down the event with his comment, "That wasn't kidnapping, she got in the car voluntarily".

The jury could readily and justifiably believe Mrs. Wade's testimony, could appropriately be impressed by considerations of the weight to be given Dr. Dickinson's testimony, and could properly conclude that Dr. Dickinson's evidence fit exactly and consistently into that of Mrs. Wade. In any event, if the defense and the prosecution materials are not to be deemed entirely consistent, the evidence of insanity here, taken with all the other evidence, was such that the jury could properly choose to reject it.

■ We therefore cannot say that the prosecution's evidence was so weak or so entitled to disbelief, in the face of the defense evidence, as to compel us to determine as a matter of law that it was insufficient to provide a jury question on the issue of competency at the time of the crime. We cannot conclude, as we must in order to remove this case from the jury's consideration, that on the basis of the evidence here "reasonable men must necessarily possess a reasonable doubt as to defendant's sanity and that reasonable men must conclude that the government has failed to sustain its burden of proving beyond a reasonable doubt that the accused had the capacity to commit the crime". United States v. Westerhausen, supra, 7 Cir., 1960, at page 852 of 283 F.2d. This compels an affirmance of the judgment of the trial court. Compare Carpenter v. United States, 4 Cir., 1959, 264 F.2d 565, 570–571, certiorari denied 360 U.S. 936, 79 S.Ct. 1459, 3 L. Ed.2d 1548; and Kelley v. United States, 1956, 99 U.S.App.D.C. 13, 236 F.2d 746.

The defense, however, urges upon us cases where appellate courts have reversed jury convictions on the ground that the prosecution did not sustain its burden of proving sanity beyond a reasonable doubt. Specifically, we are referred to McKenzie v. United States, supra, 10 Cir., 1959, 266 F.2d 524; Pollard v. United States, supra, 6 Cir., 1960, 282 F.2d 450 (one judge dissenting);[9] Commonwealth v. Cox, 1951, 327 Mass. 609,

---

9. See also the same judge's continuing dissent in the subsequent proceedings in the same case. Pollard v. United States, 6 Cir., 1960, 285 F.2d 81, 84.

100 N.E.2d 14; and to the District of Columbia cases of Douglas v. United States, supra, 1956, 99 U.S.App.D.C. 232, 239 F. 2d 52; Wright v. United States, supra, 1957, 102 U.S.App.D.C. 36, 250 F.2d 4; Fielding v. United States, supra, 1957, 102 U.S.App.D.C. 167, 251 F.2d 878, and Satterwhite v. United States, 1959, 105 U.S.App.D.C. 398, 267 F.2d 675. To this list we might add United States v. Westerhausen, supra, 7 Cir., 1960, 283 F.2d 844. There are others in the reports; see, for example, Isaac v. United States, supra, 1960, 109 U.S.App.D.C. 34, 284 F.2d 168, and Fitts v. United States, supra, 10 Cir., 1960, 284 F.2d 108.

We recognize that these cited cases involve situations, as does the present one, where expert testimony is introduced on behalf of the defendant and where usually the opposing prosecution material consists at the most of lay evidence. But that common feature does not in itself justify any general legal conclusion that the defense is then always entitled to a judgment of acquittal, or that the cases cited above in paragraph 3 are not authoritative. There is nothing essentially sacred or untouchable in expert testimony. The mere fact that the primary evidence on one side may be typified as expert in character while that on the other is exclusively from the mouths of lay witnesses and from lay facts must not of itself serve to destroy the jury's traditional function.

McKenzie, Pollard, Cox and Westerhausen certainly are not opposing authority on this proposition and are easily distinguishable on their facts from the case at bar. In McKenzie, 6 physicians and psychiatrists were of the opinion that the defendant there on the date of the alleged offense did not know the difference between right and wrong and was not criminally responsible for his acts. A seventh testified that his examination of the defendant about 6 weeks after the offense led him to conclude that he had a mental illness and that it was doubtful his condition would improve. A police officer testified to the defendant's peculiar acts. Opposing this was the testimony of arresting officers and of lay witnesses who had observed the defendant a short time before the offense and who stated that they had noted nothing unusual in his conduct. In Pollard, 6 trained psychiatrists, a psychologist, a psychiatric social worker and the chief medical officer of the Center at Springfield, being all the expert witnesses presented by both sides, were of the opinion that the defendant acted under an irresistible impulse when he attempted bank robberies or that the evidence tended to show this; the court stated that no expert or non-expert testimony was submitted in opposition. In Cox, 2 trained psychiatrists testified on behalf of the defense; there was no opposing testimony other than the presumption of sanity. A majority of the court felt that the verdict was against the weight of the evidence. It specifically recognized, however, at page 16 of 100 N.E.2d, that the probability on which the presumption rests may often be regarded by the jury as outweighing the testimony as to insanity. In Westerhausen, the defense offered 6 trained medical witnesses and a lay witness. The medical witnesses presented conclusions as to the defendant's inability to choose right from wrong at various times before and after the alleged offense and lay opinion concurred as to this on the day of the crime. One opposing medical witness offered by the government testified as to the defendant's ability to distinguish right from wrong on the basis of examinations begun a year and a half after the offense.

The evidence in each of these 4 cases seems so overwhelming in favor of the defense position that we regard as almost inevitable the courts' conclusions that the insanity issue there was not submissible. These cases thus, in our estimation, are not out of line with Dusky and the others cited above in paragraph 3.

The District of Columbia cases may be somewhat more questionable so far as

this point is concerned.[10] Even if one were inclined to regard the District of Columbia results in this area generally to be extreme, it is readily to be observed that in each of the cases cited the nature and quantum and the balance of the evidence are far different than here. Douglas [99 U.S.App.D.C. 232, 239 F.2d 59] involved "three disinterested psychiatrists" with no opposing "medical evidence whatever" and with non-expert testimony which the court felt "cut both ways, at least as deeply in the direction of insanity as of sanity". Wright involved the testimony of 11 psychiatrists, 5 or 6 of whom were of the opinion that the defendant was mentally ill at the time and the rest of whom were unable to say whether he was or was not mentally ill. The opposing evidence offered by the government was only the testimony of an arresting officer and another policeman. Three judges dissented on the ground that "there were sharp conflicts in the medical testimony" [102 U.S.App.D.C. 36, 250 F.2d 15], that even if there were not "its clash with the lay testimony would nevertheless form an issue of fact for the jury", and that the evidence "presented a typical jury question which conceivably could have been decided either way". Fielding involved 3 government psychiatrists, 2 of whom testified that the defendant was suffering from schizophrenia at the time of the offense and one of whom had no opinion as to his then condition. There was no opposing psychiatric evidence. The government offered only the testimony of the arresting officers and that of the defendant's brother and wife. Judge Danaher dissented on the ground that "the majority is substituting its judgment for that of the trier." [102 U.S.App.D.C. 167, 251 F.2d 881]. Satterwhite presented what the court regarded as only a conflict between a diagnosis of schizophrenic reaction of the paranoid type on the one hand and a diagnosis of an emotionally unstable personality on the other.

All these District of Columbia cases present, we feel, much stronger defense material than does the case before us. If, however, they are not thus to be distinguished (and the dissents would so indicate) and if Douglas (and its companions) does stand for what Judge Burger says it does (footnote 10, supra), then we are constrained to disagree with them and we adhere to our holding in Dusky, page 397 of 271 F.2d, that it is not always imperative that there be expert psychiatric testimony on the prosecution's side before the issue of a defendant's sanity may be submitted to a jury and before the fact trier's conclusion of sanity may be upheld. Although the District of Columbia opinions, so far as practical results are concerned, might be said to indicate otherwise, we do note that in Hopkins v. United States, supra, 1959, 107 U.S.App.D.C. 126, p. 158 of 275 F.2d, the court recognized, as it had specifically held some years before in Holloway v. United States, supra, 148 F.2d 665, that there may be situations where lay testimony is "reasonably thought so far to outweigh psychiatric testimony as to prove sanity beyond a reasonable doubt".

10. See, for example, Judge Burger's appraisal of Douglas in Section I 3 of his extensive separate concurring opinion in Blocker v. United States, D.C.Cir.1961, 288 F.2d 853, 863, where he says:

"Under the Douglas opinion, the case is left in the hands of the jury only if there is disagreement among the psychiatrists or if the expert testimony supports guilt; if the psychiatrists all agree that the defendant has a 'disease' and the act was its 'product,' then the issue is taken from the jury. Paradoxically we call on laymen to resolve conflicts both in technical terms and substance which the experts cannot resolve among themselves! But Douglas now denies jurors their historic right to pass on the credibility of the experts."

See, also his footnote 20, page 865 of 288 F.2d and the counter-defense of Douglas by Judge Fahy (who wrote the Douglas opinion) in his concurrence in Ragsdale v. Overholser, 1960, 108 U.S. App.D.C. 308, 281 F.2d 943, 949, and in his separate concurring opinion in Blocker, page 872 of 288 F.2d, where he protests that the court in Douglas actually did consider "the non-expert testimony along wtih the expert."

The cases cited by the defense, therefore, are not persuasive and they do not dissuade us from our conclusion that the trial court was right.

We might add by way of addendum, although, in the state of this record, we certainly are not required so to do, that we are fully aware of the controversy presently pending in the federal courts over the respective merits of M'Naghten and its irresistible impulse and other variations, and of Durham and of other suggested definitions of insanity as a defense to crime. We are aware specifically not only of Durham itself and of our rejection of it in the first Dusky appeal and in Voss, supra, 259 F.2d 699, to which rejection we continue to adhere, but of the approximately 80 cases, after Durham and occasioned by it, which have come before the Court of Appeals of the District of Columbia. We are aware, too, of the extra-judicial expressions of two present members of the Supreme Court of the United States evincing dissatisfaction with M'Naghten, and, therefore, of what this presages for M'Naghten's reception when and if that court undertakes to review it. The Durham Rule: A Meeting Ground for Lawyers and Psychiatrists, William O. Douglas, 1956, 41 Iowa Law Review 485; testimony of Mr. Justice Frankfurter before the Royal Commission on Capital Punishment, September 1953, p. 102. And we are also acquainted (a) with the earlier enlightening decisions of State v. Pike, 1870, 49 N.H. 399, State v. Jones, 1871, 50 N.H. 369, and Parsons v. State, 1887, 81 Ala. 577, 2 So. 854, and others; (b) with the Ninth Circuit's 1957 opinion in Sauer v. United States, 241 F.2d 640, 652, certiorari denied 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539, taking the position, that it is for the Supreme Court or the Congress to prescribe any departure from the established concept of criminal responsibility; and (c) with the very recent provocative and interesting opinions, majority, concurring and dissenting, of the Court of Appeals of the District of Columbia in Blocker v. United States, D.C.Cir., 1961, 288 F. 2d 853, 857, 873, (showing the breaking away from Durham of one-third of the membership of that court) and the majority and dissenting opinions of the Third Circuit in United States v. Currens, 3 Cir., 1961, 290 F.2d 751, 776, both decided since the first Dusky.

It is sufficient to say here that if the issue were now before us (comprising this particular panel of the Eighth Circuit), which it is not, we would hesitate to reverse a case where the trial court had employed instructions on insanity which this court has heretofore approved and henceforth we would be loath, indeed, to reverse where, as here, the trial court has used instructions, whether based theoretically on a M'Naghten variation or on the test set forth in the Modern Penal Code proposed by the American Law Institute or on that form revised as suggested by the Third Circuit in Currens, or whether couched in still other language, *if* the charge appropriately embraces and requires positive findings as to 3 necessary elements, namely, the defendant's *cognition*, his *volition*, and his *capacity to control* his behavior. If those 3 elements—knowledge, will and choice—are emphasized in the court's charge as essential constituents of the defendant's legal sanity, we suspect that the exact wording of the charge and the actual name of the test are comparatively unimportant and may well be little more than an indulgence in semantics. We think this approach to be sound because it preserves and builds upon those elements of M'Naghten and of irresistible impulse which are acceptable in these days and yet modernizes them in terms which a jury can grasp and apply.

The 3 elements we have described were included as conditions in the trial court's charge in this case and its definition of insanity was therefore not improper.

Affirmed.