**UNITED STATES of America,**
**Plaintiff-Appellee,**
v.
**Clifford Melvin ROBINSON, Jr.,**
**Defendant-Appellant.**
**No. 14194-5.**

United States Court of Appeals
Seventh Circuit.
Feb. 14, 1964.

Gerald M. O'Connor, Peoria, Ill., for appellant.

Edward R. Phelps, U. S. Atty., Richard E. Eagleton, Asst. U. S. Atty., Springfield, Ill., for appellee.

Before HASTINGS, Chief Judge, and DUFFY and KNOCH, Circuit Judges.

KNOCH, Circuit Judge.

Defendant-appellant, Clifford Melvin Robinson, Jr., was tried on two criminal informations, consolidated for trial, indictment having been waived, which charged him with robbery of a federally insured bank, in violation of Title 18 U.S.C. § 2113(a), (b) and (d). The defense was insanity. Trial by jury re-sulted in verdicts of guilty. The defendant was sentenced to serve three years on each count, concurrently.

Defendant contends that the government failed to sustain its burden of proving him sane beyond a reasonable doubt. He characterizes as error (1) admitting his statement into evidence, and (2) permitting cross-examination of him concerning "trouble" he encountered from alcoholic beverages while serving with the United States Air Force.

It is agreed that in the afternoon of March 5, 1962, defendant came into Table Grove State Bank, at Table Grove, Illinois, and asked for a loan, first from Douglas Baily, and then from the Cashier, Quinton Donald Baily, to whom Douglas Baily directed him. The defendant then presented a revolver with hammer cocked, directed that money be placed in a bag and given to him. Cashier Baily put the money in a regular blue canvas bag, which bore the bank's name. Defendant took it and left.

Dean R. Payne, a customer of the bank who saw the incident, testified that he and F. W. Johnson, a bank employee, both went into another room, climbed up to a high window, six feet from the floor, from which they saw the defendant's station wagon. They were thus able to call out a description of the vehicle and its license number to Cashier Baily who called the Fulton County Sheriff's office at Lewistown and passed on the information about the vehicle. State Troopers who had received the description by radio recognized the vehicle, followed it, and arrested the defendant. He was brought back to the bank in about fifteen to twenty minutes after leaving it with the money. He still had the bank's bag with the money in his possession. He was accompanied by a woman at the time of his arrest.

There were two trials. At the first trial in July 1962, after the close of the government's evidence, and after defendant had presented evidence in part, the Trial Court was advised that the defendant was mentally incompetent to stand

trial because he was unable to advise with his counsel properly and to assist in his own defense. The Court allowed a mistrial, and granted leave to file the affidavits of defendant's counsel and of Dr. Emasue Snow.

The Trial Judge later appointed Dr. Snow to conduct an examination of defendant and to report on whether he was insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense.

As a result of a hearing and the report of Dr. Snow, the Court committed defendant to the custody of the Attorney General and recommended commitment to the Medical Center for Federal Prisoners at Springfield, Missouri, on August 31, 1962.

Under date of November 28, 1962, the Medical Center reported that defendant possessed the requisite capacity, and a second trial was held which resulted in the conviction mentioned above.

Defendant's mother, Verna M. Spaulding, testified respecting traumatic incidents experienced by defendant as a child as the result of the continued brutality of his father. At the age of 12, after his parents had been divorced, defendant had shot and seriously wounded his father to protect his mother from his father's violence. Mrs. Spaulding stated that her son's childhood and youth were marked by fear. She testified to his disturbed condition on his return home after discharge from military service.

Defendant himself testified that in 1955, after a successful military career, during which he rose to Staff Sergeant, and later to Technical Sergeant, defendant began to experience nervousness, fatigue, and sleeplessness, but that examinations at the dispensary disclosed no physical abnormality. In 1957, while on electronic retraining duty, defendant consulted a service psychiatrist several times and further treatment was recommended. In 1958, while he was in Germany, he suffered serious stomach difficulties which were treated with sedatives, tranquilizers and diet. This continued in 1959. He was depressed and felt frustrated both in his work and in his personal relations. That year also included an unusual experience in that he had taken a gun to bed with him on one occasion with the intention of committing suicide. He stated that this frightened him and he sought treatment. He was admitted to the post hospital at Wurtzberg, Germany, for two short periods of treatment.

There were incidents of "trouble" related to drinking and a court-martial, and later a reduction from Technical to Staff Sergeant. He was discharged from the Air Force in October, 1961, under honorable conditions, after 16 or 17 years of service. Prior to his discharge he was examined and treated in Army facilities at Seattle, Spokane, and Larson Air Force base, in Washington State. He described emotional problems with his family. He had a prior marriage which ended in divorce. His second wife and children had left him in February 1962. At this time he began to drink alcoholic beverages to a greater extent than before to relieve the tension he felt. He thought about suicide frequently. He stated that there were gaps in his memory. He said that he had been trying to work as a Fuller Brush man, but was vague in his recollection of it. He remembered meeting a girl in a bar in Moline and something about an apartment. He could account for spending about $400 after meeting the girl. He knew that he had acquired a revolver. He remembered standing on the street looking at the place where he intended to get it for purposes of suicide, but he did not remember going in and buying it. That was the day he met his mother, March 3, 1962. She testified that he looked very ill that day. He did not remember the robbery, but did remember being in the jail afterward and remembered having told various persons about things which took place during the preceding period of time.

Mr. Baily had seen defendant and a girl pass by the bank, about fifteen min-

utes before the robbery. The operator of a Table Grove tavern testified that defendant and a girl had come in, ordered a beer, and had a conversation with her for about 15 minutes. She did not believe him to be intoxicated. Mr. Baily didn't describe defendant as intoxicated, but Mr. Payne said he had an unruly, slightly glazed look, as though he were "hopped up" or in drunken condition.

When he was arrested, defendant had a revolver in his hand which he put down when the State Troopers told him he was under arrest. He asked the Troopers to shoot him.

State Trooper Thornsbrough testified that defendant admitted robbing the bank, and when asked why, replied "Drink and women." He stated that he could smell alcohol, but that defendant did not stagger or weave, that a bottle of vodka in his possession was unopened.

Philip Edwin Corbett owned the farm at which defendant was arrested. He had known defendant for 25 years and had been close friends with him since boyhood. He was surprised to see defendant home, thinking he was still in Germany. He had spoken briefly to defendant for about 30 seconds through the window of the police car in which defendant was sitting. One of the State Troopers told Mr. Corbett that defendant had robbed a bank. Mr. Corbett then asked defendant if that were true and defendant said "yes." He said that defendant was flushed, his eyes glassy, and that defendant was laughing, appearing mentally abnormal to him. He detected no odor of liquor but he "wasn't that close" as defendant was on the far side of the car, and Mr. Corbett was standing on the driver's side.

The defendant testified that he tried to commit suicide by cutting his wrist with a razor blade while he was at the Fulton County jail, but that it did not bleed much and that he did not think anyone noticed the blood. Later F.B.I. Special Agent Marcus E. Sharpe interviewed defendant in the evening from about 8:00 to 9:15 p.m. He noticed that defendant was acting peculiarly, and the Deputy Sheriff called a physician who gave defendant a "tranquilizing serum."

Defendant dictated a statement to Agent Sharpe who testified that defendant clearly knew the difference between right and wrong at that time. At the conclusion of the statement, the defendant had said he might have been in error in his designation of the place where he and the girl first discussed robbing a bank, that he could not now recall where it was. The defendant's mother testified that when she saw the defendant at the Peoria County jail on March 6, 1962, the next day, he told her that he did not recall robbing the bank.

Dr. Snow testified respecting her examination of the defendant on nine occasions, aggregating 10 hours of examination in all, describing her examination and findings in detail. She had used the official method of the American Psychiatric Association for evaluating mental illness, as set out in the Diagnostic and Statistical Manual of Mental Disorders (1952).

In answer to a lengthy hypothetical question incorporating all the evidence as the defendant viewed it, Dr. Snow was of the opinion that defendant was psychotic and unaware of the right and wrong of the acts of bank robbery; that the robbery here was in reality another suicide attempt by the defendant.

The government produced no medical witnesses. As indicated, two lay witnesses, Trooper Thornsbrough and Agent Sharpe, testified, for the government, that from their observation defendant was sane at the time of the robbery.

■■ The issue on insanity was a factual issue for the jury. It is within the province of the instructed jury to determine the credibility of the witnesses and the reasonable inferences which may be drawn from their testimony. U. S. v. Mitchell, 7 Cir., 1963, 319 F.2d 402, 404. There is no issue before us on the competency of the defendant to stand trial, nor is error charged in the instructions given the jury. In finding

defendant guilty, the jury found him sane.

■ The government was not obliged to provide an expert of its own. U. S. v. Cain, 7 Cir., 1962, 298 F.2d 934, 936. The jury was given a full and complete view of the bases for the opinion expressed by Dr. Snow, not only on direct examination by counsel for defendant, but on cross-examination by counsel for the government. The government may rely on the evidence elicited from defendant's expert witness. Hawkins v. U. S., 1962, 114 U.S.App.D.C. 44, 310 F.2d 849, 852.

We can conjecture as to possible reasons for the jury's having found defendant sane, contrary to the opinion of the one expert witness presented. The jury may well have given weight to the fact that Dr. Snow did not see the defendant until three months after the alleged crime, long after the experienced lay witnesses, who saw him the same day the robbery was committed.

Perhaps the jury were adversely impressed by lack of supporting evidence covering the findings of the military psychiatrists, whose treatment and advice the defendant mentioned in his own testimony, in the light of Dr. Snow's opinion that the defendant had shown indications of anxiety for some seven years and had suffered anxiety neuroses for two years.

Much was said of suicide attempts. The jury may have been rendered dubious of these by the facts that defendant never carried these attempts far. He took a gun to bed with him, but didn't use it. He cut his wrist but said he was afraid to cut very deeply lest he damage a tendon, and, should he be unsuccessful in killing himself, be left with a useless hand. The loss of blood was so slight as not to be noticed by the others present. The defendant said that he told Agent Sharpe about his wrist and the blood. The defendant spoke of wanting to shoot himself. He said he bought the firearm used in the robbery for that purpose, but he used it only in the robbery.

Dr. Snow testified to a pattern of errors in decision as a part of the psychotic condition, but no such pattern appeared in the evidence. As the government suggests, the very decisions on which Dr. Snow relied, as inconsistent with defendant's demonstratedly superior intelligence, e. g. using his own station wagon, with his own license plates, in a community where he had been known since boyhood, parking his vehicle in view, driving slowly away from the bank, going to an old friend's farm—all might lead the jury to a contrary conclusion. Stealing an automobile, driving without license plates, speeding away would only risk attracting attention. But for the presence of mind that sent Mr. Johnson and Mr. Payne climbing up to a window six feet off the ground, defendant's vehicle would not have been seen leaving the place, to which he had moved it just prior to the robbery, during the few seconds it was exposed to view even from that small high window. The defendant had been away from the community for years. Mr. Baily did not recognize him. Mr. Corbett thought he was still in Germany.

In the tavern conversation, as indicated in the testimony of the tavern operator mentioned above, defendant had indicated his awareness that stealing was wrong when he spoke of observing looting after a fire in that same tavern building from which he had helped to rescue property from the flames.

We cannot conclude that the evidence was so overwhelmingly one-sided as to justify taking the issue of insanity from the jury. Dusky v. U. S., 8 Cir., 1961, 295 F.2d 743, 757, cert. den. 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536.

■ With respect to the statement made by the defendant to Agent Sharpe, we have before us no question of coercion. Defendant said he was treated "very nicely." He remembered making the statement. The case on which defendant relies deals with coercion: People v. Smith, 1962, 25 Ill.2d 428, 185 N.E. 2d 150, 151. The defendant Smith tes-

tified that after several days in jail, he was visited by his parole agent who asked him if he committed the crime. When he said he had not, the agent cursed him and told him he would sit in jail until he confessed. Smith had asked to have his mother and his attorney called, and had been told by other police officers that as a parole violator he had no rights. The police officers testified that he had been told that. The parole agent did not testify. Smith said that when the police promised him leniency if he confessed, he did confess. The defendant in the case before us does not claim that he was coerced by the officers to whom he spoke or by the "tranquilizing serum" given him, but contends only that, as in Smith, all persons present should have been produced as witnesses. Had there been a claim of coercion, production of all witnesses might be in order. Here the defendant merely says that he no longer remembers what he said or what actually happened at the bank. That is a factor affecting the weight rather than the admissibility of the statement he made to Agent Sharpe. The possible error in designating the place of discussion of the plan to rob a bank was clearly brought to the jury's attention.

The defendant also contends that he was improperly examined over his objection respecting his "trouble" with alcohol only to damage his character which was not in issue. However, defendant in cross-examining the government's witnesses repeatedly asked whether defendant appeared intoxicated. Defendant spoke of drinking, on direct examination. In his statement to Agent Sharpe, he had said that he and the girl with him had been together nine or ten days, drinking most of the time and were about out of money. The evidence of prior drinking troubles was relevant to the prior memory lapses, anxiety, etc. mentioned by defendant and Dr. Snow.

The Court wishes to express its appreciation of the devoted and skilled efforts of Mr. Gerald M. O'Connor, of the Illinois bar, who represented defendant in this appeal without compensation as Court-appointed counsel.

Our review of the record leaves us with the conviction that the judgment of the District Court must be affirmed.

Affirmed.