## BYRD v. PESCOR, Warden.
### No. 691.

### District Court, W. D. Missouri, S. D.
#### Oct. 17, 1946.

Louren G. Davidson, of Springfield, Mo., for petitioner.

Earl A. Grimes, Asst. U. S. Atty., and Thomas A. Costlow, Asst. U. S. Atty., of office of Sam M. Wear, U. S. Atty., all of Kansas City, Mo., for respondent.

REEVES, District Judge.

The petitioner seeks his relief from a sentence of 5 years in prison imposed on March 1, 1946. The sentence was imposed after his conviction of having made an assault upon a government officer while on government property, namely, the United States Hospital No. 90 at Muskogee, Oklahoma. The petitioner challenges the validity of the conviction on the principal ground of a failure of due process, in this, that he was insane at the time the crime was committed, at the time of his trial and conviction, and at the time of his sentence.

It was asserted by him that, prior to all of the times mentioned in the indictment, he had been judicially declared insane and that by reason thereof the district court was without jurisdiction to try or sentence him. The testimony was that as early as 1935 the petitioner had been confined in the Milledgeville State Hospital at Milledgeville, Georgia, as a mental case. In fact he had been confined there on three different occasions. On his admission to that institution the medical staff believed him to be without psychosis, but, before being released, his case was diagnosed as psychosis with psychopathic personality.

He escaped from the hospital on his third confinement and, to clear the record, it was made to appear that he was discharged. One of the commitments to the Milledgeville State Hospital was made on January 12, 1943, by F. E. Grabels, Ordinary of Habersham County, Georgia. The order of commitment contained a recital as follows:

"The above and foregoing matter coming on to be heard in accordance with previous order and after hearing evidence in said case, it appears that the facts set forth in the petition by Dr. John W. Oden are true. Therefore, it is considered, ordered and adjudged that Slayton C. Byrd, the said insane person be committed to the Milledgeville State Hospital, and it appearing to be necessary, the said insane person not being a fit person to be left at large, it is further ordered that he be temporarily committed to the common jail of said County until he can be removed to said hospital."

There was evidence that petitioner escaped from said hospital on May 30, 1944, and a record of his discharge was thereafter made as of May 30, 1945. There was other evidence tending to show adjudications of insanity prior to the commission of the crime for which he was convicted. The crime for which he was sentenced was committed on March 16, 1945. On

the 11th day of May, 1945, he was duly arraigned upon an indictment in the Eastern District of Oklahoma in regular session at Muskogee. At that time he was represented by counsel, namely, W. F. Rampendahl, Esq., and upon such arraignment the record shows:

" * * * a plea of not guilty is entered by counsel for said defendant upon the ground of insanity."

The court records further show that an order was made by the court at the time the plea of not guilty was entered directing that an examination be made by a psychiatrist. On the 21st day of June, 1945, the petitioner, with his counsel, again appeared in court, "and the United States appeared by Cleon A. Summers, United States Attorney, and after hearing the evidence of psychiatrists and physicians the court finds that the mental condition of the defendant at this time is such that he cannot rationally assist in his defense and that he is so abnormal that it would be unjust to try him, and that he is at this time insane and cannot properly be placed upon trial on the charge in the indictment herein." Upon this finding the court entered an order committing him to the custody of the Attorney General, " * * * for confinement in St. Elizabeth's Hospital, Washington, D. C. as provided by Section 212 of Title 24 of the United States Code Annotated for the period of his mental incompetency."

The court records further show that, on the 1st day of February, 1946, the attorney for the petitioner, W. F. Rampendahl, Esq., filed a petition on behalf of the petitioner which was in its nature a plea for aid in forma pauperis in the issuance of subpœnas on behalf of the petitioner. The petition was granted and in the order the following pertinent recital was made:

"It further appearing to the court that said defendant has heretofore been declared insane and that his defense will be that of insanity at the time the offense stated in the indictment was alleged to have been committed, and

"It further appearing to the court that one of the witnesses desired to be subpœnaed on behalf of the defendant is a physician and that it is his desire to call the said Dr. F. M. Adams of Vinita, Oklahoma, as an expert witness.

"It is therefore ordered, considered and adjudged that the Clerk of this Court issue forthwith the process of this court, viz.: subpœnaes at government expense, for the following named witnesses:

"Dr. F. M. Adams, Vinita, Oklahoma,

"Dr. A. N. Earnest, Muskogee, Oklahoma, and

"George Thompson, Muskogee, Oklahoma,

"It is further ordered and adjudged that the said F. M. Adams be allowed fees as an expert witness in a reasonable sum and that such fees be paid by the United States of America."

There was evidence on behalf of the petitioner that Dr. Adams testified in the case and concerning his testimony wrote the petitioner a letter preliminary to the trial of this cause. Such letter was offered and received in evidence without objection. The records of the trial court further show that on February 20, 1946, petitioner's attorney filed a motion for a new trial wherein, among other things, he alleged:

"2. That the verdict of the jury is both contrary to the law and the facts for the reason that prior to the trial defendant had been adjudged by the State Court of Georgia as insane and as a lunatic; and for the further reason that the trial Court had on June 21, 1945 found defendant to be insane as of that date; and for the further reason that no evidence was introduced to show a difference in the mental condition of defendant on March 16, 1945 the date of the offense set forth in the Indictment returned in the cause and the 21st day of June 1945."

This motion was overruled on March 1, 1946, and judgment was entered and a sentence imposed for a period of 5 years. The commitment contains a recital:

"The defendant having been convicted on a verdict of guilty of the offense charged in the indictment * * * to wit:

"1. Assault upon government officer on government property, to-wit: U. S. Hospital No. 90, on March 16, 1945, Muskogee

County, Oklahoma, and the defendant having been now asked whether he has anything to say why judgment should not be pronounced against him, and no sufficient cause to the contrary being shown or appearing to the Court,

"It is by the Court ordered and adjudged that the defendant, having been found guilty of said offenses, is hereby committed to the custody of the Attorney General or his authorized representative for imprisonment for the period of Five Years * * * or until said defendant is otherwise discharged as provided by law."

Upon this record it is contended by counsel that, perforce the ruling in Ashley v. Pescor, 8 Cir., 147 F.2d 318, it is the duty of the court to inquire into the sanity of the petitioner and to adjudicate upon the facts wholly apart from the adjudication and trial in Oklahoma, whether the petitioner was in fact insane at the time of his trial and conviction.

1. From the foregoing it is obvious that when the petitioner was tried in the Eastern District of Oklahoma, on February 18, 1946, the question of his sanity was made a defense and an issue and that there was a finding by the jury that he was guilty. The inference is inescapable that his plea of insanity failed. In other words, the jury found upon an issue of insanity obviously submitted to the jury that the petitioner was sane and responsible for the crime committed by him.

■ Ordinarily, and upon the great weight of authorities, this would be conclusive and close the matter, as it is the rule of almost universal acceptance that the question of a prisoner's insanity at the time of conviction and sentence should have been raised by direct appeal and could not be raised by collateral attack as in habeas corpus.

In the case of Srygley v. Sanford, Warden, 148 F.2d 264, loc. cit. 265, Judge McCord of the Fifth Circuit Court of Appeals said:

"The law does not warrant the making of a collateral attack by way of habeas corpus, but this question should have been raised by direct appeal."

A wealth of authorities was cited in support of this proposition.

Moreover, the Court of Appeals, in the Ashley case, said that a prior adjudication of insanity "constituted at least prima facie evidence of incompetence" [147 F.2d 321], and, "we need not hold that the adjudication of insanity could be attacked only by a direct proceeding, but at least it constituted prima facie evidence of incompetence *and there is no evidence in this record overcoming the presumption of insanity arising therefrom.*"

It will be observed that the Court of Appeals believed that the presumption of a continuing status of insanity was not overcome by any evidence at the trial of the Ashley case, but intimated that it could be overcome. In this case certainly the issue of insanity arising from the presumption of a continuing state of insanity was overcome by the evidence at the trial. When the court overruled the motion for a new trial filed by petitioner's attorney it amounted to an adjudication that there was testimony to show the competency of the petitioner.

2. The remaining question is whether the Ashley case compels a trial de novo on the issue of insanity on habeas corpus, where it appears that the petitioner had been previously adjudicated as an insane person. It seems proper to make reference to the Ashley case and the circumstances under which the court's decision was reached. The Court of Appeals rejected the findings of fact made by the trial judge with the laconic words: "We find no evidence in the record bearing upon or tending to prove these facts." 147 F.2d loc. cit. 320. And, again, "There is no evidence in this record overcoming the presumption of insanity arising therefrom." 147 F.2d loc. cit. 321.

The Ashley case was tried piecemeal. For several terms the petitioner Ashley was in court and presented evidence. A reporter system had not been provided by the Congress, and no record of the testimony was kept. The author of this opinion was the trial judge in that case. Notes were taken and the findings of fact were based upon the testimony actually taken

and actually heard in court. The appeal by the petitioner Ashley did not undertake to carry to the Appellate Court a tran-, script of the record. He stood on certified copies of adjudications of insanity. No effort was made to provide the Appellate Court with a record of the trial. The facts abundantly established that the petitioner Ashley had not only violated the law once, but many times. He secured adjudications of insanity either ex parte or by collusive arrangements. Equipped with such certificates of incompetency he preyed upon the public and defied the authorities. At last he was indicted in the Western District of Louisiana, at Monroe. He undertook to answer the indictment with his usual plea of insanity and tendered that issue, and again proffered his ex parte and collusive adjudications in support of his plea. The government prepared to meet his defense. He was examined by alienists who were in court ready to testify to his complete competency, and even superior shrewdness. Petitioner Ashley and his counsel thereupon withdrew his plea of insanity, acknowledged his guilt, and received a sentence. Apparently he did this upon the theory that, "He who fights and runs away will live to fight another day; but he who is in battle slain will never rise to fight again." He was unwilling to wage battle upon the issue of insanity, and he by-passed the court. Just as soon as he was lodged in prison upon the sentence, he began applying for his discharge by habeas corpus on the ground that he had been adjudicated an insane person. At the habeas corpus trial the court heard much testimony. The petitioner Ashley did not pretend that he was insane or that he had ever been insane. He did assert that he was protected by adjudications of insanity. He did not controvert or deny the correctness of the findings of fact made by the court after a prolonged trial on habeas corpus. He accepted them as true but stood on the sole proposition that, having been adjudicated an insane person, he enjoyed complete immunity from trial or further prosecution until affirmatively found to be sane. Of course, when the Court of Appeals rejected the findings of fact made by the trial judge and based its decision solely upon the ex parte and collusive adjudications offered by petitioner Ashley, it could reach no other conclusion. Petitioner Ashley was ordered discharged by the court, and, then, armed with his certificates of insanity, and reenforced by the aegis of Olympus, he was again prepared to prey upon the public as his meat and his dish. Surely the Court of Appeals did not mean to say that an accused person should be permitted to interpose, and then withdraw, a plea of insanity when confronted with proof of his competency, voluntarily receive his sentence, and, then, later, challenge the validity of the proceeding on the ground that he was insane at the time of his trial. The decision in the Ashley case, as construed by counsel, would be an invitation to a criminal to withhold the defense of insanity, and, then, when far removed from the place of trial and in different surroundings and at a different time, establish by his own proof and ex parte adjudications his right to a discharge on the ground of insanity.

The petitioner Ashley tried his own case, both in the trial court and in the Court of Appeals. The report of the case shows "James R. Ashley, in pro. per." This means that he was present in his own person or character and clothed in his right mind.

■ It is the rule that an insane person or a lunatic is not a person in the eye of the law. In re Kehler, D.C., 153 F. 235; 48 C.J. 1038.

The Ashley case presents the anomalous situation where an insane person, so considered by the court, is permitted to prosecute an action in his own name, act as his own counsel, nullify his conviction, and obtain his discharge from custody. If counsel be correct, Ashley has shrewdly secured for himself the status of legalized lunacy and complete immunity from prosecution for his transgressions. On the one hand he is competent to try his own case and win his liberty but on the other he is not competent to stand trial.

The facts in the Ashley case as they really were, or even as found by the Court of Appeals, are not comparable to the facts in this case.

Under the weight of the authorities, the petitioner is not entitled to his discharge and his application therefor should be denied. It will be so ordered.