**UNITED STATES of America,
Plaintiff,**

v.

**Harold Pitts ROE, Defendant.**

**No. 21314.**

United States District Court
W. D. Missouri, W. D.
Jan. 10, 1963.

William A. Kitchen, Asst. U. S. Dist. Atty., Kansas City, Mo., for plaintiff.

Kenneth Simon, Kansas City, Mo., for defendant. (Appointed by the Court)

JOHN W. OLIVER, District Judge.

This case pends on defendant's alternative motion for directed judgment of acquittal or for new trial. Because that motion will be sustained, we believe the Government is entitled to a full statement of the reasons, as we see them, for our action.

Defendant was indicted and found guilty by a jury of a violation of Section 1621 of Title 18, United States Code. His defense was insanity.

The alleged perjury was committed in connection with testimony given by defendant in support of his motion, filed pursuant to Section 2255 of Title 28, United States Code, to vacate an earlier sentence imposed upon his pleas of guilty made April 28, 1961 to violations of Sections 500 and 2312 of Title 18, United States Code.

Defendant's Section 2255 motion, and his testimony in support of that motion, was to the general effect that he

entered his plea of guilty only because he had been beaten, threatened and coerced by the jailer of the Jackson County, Missouri, jail, and by an agent of the Federal Bureau of Investigation. Except for the question relating to defendant's mental condition at the time of the offense, there is no doubt but that the Government's evidence was more than sufficient to support the jury's verdict of guilty. Defendant's counsel does not contend otherwise. The question of whether defendant was mentally competent to have committed the crime of perjury has, from the outset, been the only real question in this case.

Defendant was indicted for the present offense on May 4, 1962. Because he had to be returned from Alcatraz, arraignment was set for May 11, 1962. On May 9, 1962, this Court appointed John J. Fallon, Esq. of the Kansas City Bar, as defendant's counsel and ordered that Mr. Fallon be permitted to interview defendant at the United States Penitentiary at Leavenworth prior to arraignment.[1]

When defendant was before the Court for arraignment on June 1, 1962 he refused to accept Mr. Fallon as his attorney because, according to defendant, Mr. Fallon's name had been discussed in a conversation between defendant and another inmate at Alcatraz before defendant left there. Mr. Fallon's name was supposedly mentioned as one of the Kansas City attorneys that defendant should avoid. Defendant's friend at Alcatraz was quoted as having told defendant: "Whatever you do, don't let them put that monkey on your back". The Court relieved Mr. Fallon and Mr. Jenkins of further duty and appointed Kenneth Simon, Esq. to represent defendant. Mr. Simon was acceptable to defendant.[2]

---

1. On May 10, 1962, John M. Jenkins, Esq. of the Kansas City Bar, was appointed as additional counsel for defendant to assist Mr. Fallon.

2. At least Mr. Simon survived until after the trial. While the present motion was under advisement, and after Mr. Simon had filed a brief in support of this mo-

tion, the Court received its most recent letter from the defendant requesting that we "grant Mr. Simon leave to withdraw from my case". Mr. Simon, of course, has not joined in this request and the record shows that he has, under difficult circumstances, represented the defendant will skill and dedication.

The Court handed Mr. Simon two motions that defendant had filed pro se in which defendant alleged he was mentally ill and requested Mr. Simon to explain and consult with defendant as to whether he wanted to file a motion pursuant to Section 4244 of Title 18, United States Code.[3]

After conference, Mr. Simon advised the Court that defendant decided to waive the reading of the indictment and to enter a plea of not guilty. The Government then made its motion that defendant be examined under Section 4244. Mr. Millin, the United States Attorney for this district, quite correctly pointed out that "all the papers that he (the defendant) has filed so far indicate that there is a great deal of doubt as to his mental competency". The Government's motion was sustained and Springfield Medical Center was designated as the place where the requested psychiatric examination would be conducted.[4]

In due time the report of neuropsychiatric examination made by Charles R. Keith, Assistant Chief of the Psychiatric Service of the Medical Center, was forwarded to the Court. Dr. Keith's report was dated July 31, 1962. Two reports of Neuropsychiatric Staff examinations, the first dated August 2, 1962, and participated in by Drs. Settle, Keith, Siegel and Milofsky, and the second dated August 23, 1962, and participated in by Drs. Settle, Oppegard, Keith and Coons, were also forwarded to the Court.

Because all three of these reports were eventually admitted in evidence at the trial without objection by the Government, and because Dr. Keith testified for the defense, the reports must be carefully considered in regard to the basic question raised by defendant's present motion.

In the "Background" section of Dr. Keith's report of July 31, 1962, it is stated:

"The patient, the third of five children, was born on 7–2–30 in Hendersonville, Tennessee. Data concerning the patient's childhood years is not inadequate. When the patient was ten years old his mother died and he was subsequently reared by a grandmother. His father remarried and saw very little of the patient after the death of the patient's mother. * * * The patient completed a grade-school education and then worked on his grandmother's farm and factories in the nearby community. The records indicate only one arrest as a teenager, for which the patient spent a few days in jail.

"At the age of eighteen the patient entered the U.S. Army and within six months had become charged with AWOL and stealing a revolver for which he was given a military sentence and a bad conduct discharge. Psychiatric and psychological examinations at that time revealed that the patient was a 'pleasant, agreeable and friendly' man who showed no evidence of a severe mental illness. Testing indicated that the patient was quite immature and could only adjust to reality on a simple, concrete level. An IQ of 72 was found at that time indicating probably a lack of proper environmental stimulation. The patient served a brief sentence in the Army and then received a bad conduct discharge. The patient returned to civilian life and then entered a brief marriage. * * * Concurrently with the dissolvement of his former marriage, the patient immediately began to get

---

3. During the entire course of this case, defendant has filed directly with the Court numerous pro se motions, what he calls "letters of record", and protests of one sort or another. Those mentioned above were but the first two in a long series of communications received by the Court from defendant which has continued to within the last week.

4. During the period of defendant's examation at the Springfield Medical Center for Federal Prisoners, defendant continued to file various and sundry of the above mentioned "letters of record" and motions with the Court and on one occasion sought to discharge Mr. Simon as his attorney.

into trouble with state and Federal authorities. He stole cars, cashed bad checks, took part in robberies, all of which kept the patient in state and Federal penitentiaries almost continually since 1949."

In the "Present Difficulties" section of Dr. Keith's report of July 31, 1962, it is stated:

"The patient was released from the Tennessee State Prison in July 1960. At this point the patient's current version of his life during this period and the official records begin to diverge. According to the patient's earlier statements and the official records, he apparently began to roam across the Midwest and Eastern United States, burglarizing stores and cashing checks and stealing cars. The patient now states that he was roaming over the country trying to find work, drinking, and all of the charges that he robbed and stole are 'trumped up'."

After reciting the facts concerning defendant's two five year consecutive sentences in April of 1961 for violations of the Dyer Act and forgery, (which were the subject of defendant's Section 2255 motion), Dr. Keith's report continues as follows:

"The patient was initially sent to Leavenworth because of his escape record and there he became implicated in an escape plot through the sewers. The patient now says that he was 'ratted off' by another inmate there who carried a grudge against Roe for several years, whereas in actuality Roe claims he had nothing to do with the attempted escape. According to the Leavenworth records, the patient was making plans to capture a hostage for the escape attempt, a fact which Roe now vigorously denies. Nevertheless, the patient was transferred to Alcatraz and shortly after his arrival there he began to write numerous legal petitions to his committing court in the Western District of Missouri charging that he had been mistreated dur-

ing and after his arrest and forced to plead guilty, and had been denied several legal rights."

Dr. Keith's report shows that defendant at first refused to cooperate in regard to any neurological examination and that the psychological examination was conducted under difficult conditions. In the section of that report dealing with those two subjects, it was stated:

"Upon the patient's admission a physical examination was entirely within normal limits. * * * Later during the patient's hospital course a neurological examination was attempted, but the patient refused in spite of careful attempts to explain the nature of the examination * * The patient is a short, well-built, neat appearing man who appears his stated age of thirty-one. He greets the examiner with a superficially warm smile and initially was able to talk about himself fairly openly. However, as the interview progressed the patient became increasingly suspicious and became fearful that we would 'find him crazy'. The patient appears to be well oriented as to time, place and person and the patient perceives the world about him suspiciously and wonders who he can trust. This suspiciousness is conveyed both in the patient's thought processes and emotions. Presently the patient's suspiciousness amounts at times to clear-cut paranoid thinking in which there is rather poor reality testing, whereas in other areas the suspiciousness is minimal and the patient is able to check himself."

The following portion of the same section of Dr. Keith's report gets closer to defendant's mental processes concerning the subject matter of his Section 2255 motion, his transfer to Alcatraz, and his motivation for litigation. It is there stated:

"This suspiciousness affects much of the patient's thinking. He believes that because of the maltreatment he received at the hands of the

law enforcement officials during his arrest that now the court and the officers are trying hard to have him 'locked up and out of sight' so he will not bring these facts to light. The patient explains his transfer to Alcatraz on the basis of the court wanting to get him out of the Leavenworth area, which was too close to the scene of the misdeeds. Similarly the patient was quite afraid of the present examiner, suspecting that I, too, was commissioned by the court to find signs or symptoms of mental illness within him. * * * The patient's thought content was almost totally preoccupied with these legal matters and this supposed miscarriage of justice. * * *

"The patient's most striking areas of psychopathology were in his interpersonal relationships. * * * The patient portrays himself as a member of the prison culture, operating within the prison code of conduct. This examiner is of the opinion that the patient's recent burst of litigiousness has the appearance of more open suspiciousness and the early paranoid thinking may represent the beginnings of a more severe personality decompensation. Heretofore the patient has been able to function as a 'sociopathic' personality in the rigid confines of institutions, but for some unknown reason his defenses may be failing."

The "Diagnosis" section of Dr. Keith's report stated:

"DIAGNOSIS: 000-x44 Paranoid personality as manifested by suspiciousness and some ideas of reference, almost total withdrawal from interpersonal relationships, an almost total inability to live outside of an institutional setting, of a sociopathic defense mechanisms and the use of extremely hedonistic modes of behavior. The recent changes in the patient's personality, such as increasing suspiciousness and litigiousness may indicate the beginnings of a more severe personality decomposition."

The Staff Examination report of August 2, 1962, shows that Dr. Keith eventually was able to conduct a neurological examination of defendant. That report stated:

"In the recent N-P examination it was noted that the patient refused a neurological examination. However, since the dictation of that examination, the patient agreed to undergo a neurological examination and the following facts are noted. In 1959 the patient had some type of a neurological disease which resulted in a weakness of his left facial muscles, left arm and left leg. * * The examination revealed a slight left lower facial muscular weakness and the patient had difficulty protruding his tongue into his left cheek. Examination of the eyes was normal. There was a slight weakness of all the groups in his left arm and of the left lower leg muscles. * * * Deep tendon reflexes are slightly reduced on the left side as compared to the right. Chances are these neurological signs are a result of an old cerebralvascular accident which probably occurred in 1959. The patient is not handicapped by these mild neurological signs and the neurological deficit does not appear to play an integral part in the patient's present difficulties."

In reaching its conclusion that the defendant was competent to stand trial—and it must always be remembered that the question of whether he was competent to stand trial within the meaning of Section 4244 of Title 18, United States Code, is not the same question as to whether he was or was not mentally competent at the time the offense was committed—the first Staff report stated:

"After much discussion, it was the opinion of the N-P staff today that the patient's suspiciousness and paranoid ideation do not significantly interfere with his ability to un-

derstand the nature of the present legal proceedings. However, the patient's mistrust of the court may interfere somewhat with his ability to cooperate with his lawyer. That is, he may discharge lawyers in the future who do not agree with him. The Staff believes that the patient's present symptomatology may indicate the beginnings of a more severe personality breakdown, probably of a paranoid nature. However, as noted above, this early symptomatology does not seem to significantly interfere, as yet, with the patient's ability to understand the nature of the charges against him. At the present time the medical and neurological findings do not appear to play a significant role in the patient's present personality function and his dealings with the court."

The Neuropsychiatric Staff made its second report on August 23, 1962. That report considered additional facts not considered by the Staff in connection with its first report but nevertheless concluded that Dr. Keith's initial evaluation and the first Staff report "could not significantly be improved upon". The second report did, however, add the following:

"In our judgment, he cannot be categorized at this time as legally insane, psychotic, or as presently certifiable under Section 4241. The Staff could not establish to its satisfaction that Roe's description of the events prior to his trial and conviction were either delusional or deliberate falsifications, but considered it more likely that he is subconsciously elaborating on what were probably casual and trivial physical contacts between him and law enforcement personnel during his arrest and detention. * * * We see him as competent to proceed, realizing that the evaluation of the degree of paranoid traits is extremely difficult, and

that the judicial decision is therefore a difficult one. Pragmatically speaking, in regard to Roe's pursuit of 'justice' on this particular matter, the manner of the current disposition will have little effect on his continuing efforts."

On October 12, 1962 the hearing required by Section 4244 was held. The Court made a judicial finding, based on three reports, that defendant was competent to stand trial. Defense counsel indicated at that time that the "heart of the problem" so far as trial was concerned related to defendant's mental competency at the time of the offense and indicated that insanity would be defendant's defense. A plea of not guilty was entered and the case was set for trial.

At the trial of the case, and before any witnesses were called, defense counsel again made clear that he intended to call Dr. Keith as a defense witness and that he intended to introduce the three reports in evidence. Counsel for the Government indicated that it had no objection. Nor did it suggest that it would adduce any additional evidence in regard to defendant's mental condition.

The Government called witnesses that established beyond any reasonable doubt that if defendant was legally sane at the time of the offense that he was guilty as charged. In fact, the Government established beyond reasonable doubt that neither the jailer nor the FBI agent even so much as touched the defendant during the critical times in question. And defendant's counsel admitted in final argument that "there is no contest but what this man was not touched, beaten or mistreated in the county jail". The Government, however, introduced no medical evidence; nor did it examine its lay witnesses in regard to defendant's mental condition.[5]

▇ The Government, of course, is entitled to the benefit of any evidence introduced by the defendant and the crucial

5. Government witness Sanders, the FBI agent, did testify on cross-examination that if defendant suspected that he had

been mistreated by the witness, it would have to be "all imagined".

question for our present decision boils down to whether the medical evidence introduced by the defendant, and any other evidence from any witness, was sufficient to enable the Government to now say that it carried the burden of proving that defendant was sane at the time of the offense.

From the summary of the three medical reports above it is apparent that "the Staff could not establish to its satisfaction that Roe's description of the events prior to his trial and conviction were either delusionary or deliberate falsifications * * *". The Staff did say that it "considered it more likely that he is subconsciously elaborating on what were probably casual and trivial physical contacts between him and law enforcement personnel during his arrest and detention". But it is clear that there were in fact no "casual and trivial physical contacts" at all. And it is also clear that the neurological examination revealed objective neurological signs affecting defendant's left side that might have been connected with an old cerebralvascular accident which probably occurred in 1959.

■ We cannot believe that proof is established beyond a reasonable doubt when the trained and experienced minds at Springfield Medical Center cannot establish to their own satisfaction whether defendant's description of the circumstances of his arrest and detention were either delusionary or deliberate falsifications. To say that twelve jurors could be able and should be permitted to make that choice beyond reasonable doubt rests upon the necessary premise that sufficient evidence has been presented to them upon which they may base a definitive finding. We do not believe that it can be said the three reports, standing alone, constitute that sort of evidence.

And Dr. Keith's testimony was, if anything, less definitive than the evidence contained in the three reports. Dr. Keith testified that "it was difficult for us to arrive at a definite conclusion * * * as to whether he was delusional or misrepresenting facts"; that all the doctors at Springfield (not less than six considered defendant's case) "debated at some length as to whether there were actually what you call frank delusional ideas * * * we spent much time discussing this particular point"; and that "some felt that the patient honestly believed these things through and through. Others felt that there was an element of conscious deception".

When Dr. Keith was asked whether "your staff did not believe beyond any doubt that he was trying to deceive anybody in making these persistent statements of mistreatment", he answered "this would pretty much sum up the majority of the staff members". He explained his answer further by stating:

"This is a difficult concept to try to discuss. This isn't a black or white issue. Either something is a deception or a delusion, and I think I could illustrate that a bit by describing a long spectrum of events * * *.

"And in our debating Mr. Roe's case, we felt his psychological situation was in that very difficult middle area there. If he were on one end of the spectrum or the other end of the spectrum, there wouldn't be much vacillation in our minds, but he falls right in that gray area, which, as he told us, there could be some reality to what he said. We didn't know whether he was beaten on or not. We had no way of deciding this."

Dr. Keith did testify that the final Staff opinion put the defendant "more on the reality end of the spectrum", but he also made clear that "it is in a gray area, and it was a very difficult decision" to determine that he was able to understand the nature of the charges.[6] Dr. Keith made clear that the determination

---

6. Compare Judge Blackmun's similar concern expressed in Dusky v. United States, 8 Cir., 1961, 295 F.2d 743, 755, wherein he said: "Because we are subject to the natural and ever present judicial desire for absolute certainty, we might wish as always that the evidence consisted entirely of positive blacks and whites and

of that question did not "foreclose the possibility of legal insanity" because "the tests for one are not the same as the tests for the other". Dr. Keith further testified that:

"It was our opinion that something has happened to the patient in the last year or two, and he may be experiencing a personality breakdown, and if things do go badly for him—we hope they don't—but if he continues to—if this suspiciousness he now has continues to stand and grow it will develop into more and more, franker, delusional ideas. We would move down to the other end of the spectrum."

Dr. Keith also testified that it was entirely possible when the defendant appeared in court in April 27, 1962 (the date he gave his testimony in the Section 2255 proceeding) he may have been in a state of remission so that his mental illness would not have been apparent to anyone at that time. On recross-examination by the Assistant United States Attorney, Dr. Keith testified that he was of the opinion that the defendant was sufficiently mentally ill to require institutional care. Dr. Keith reiterated that the defendant "has been able to live in institutions for many years with no difficulty" but that "something has been happening the last year or two that seems to be unusual for him".

We do not believe that Dr. Keith's testimony either separately, or taken in conjunction with all the other evidence in the case, can be said to supply the sort of evidence upon which proof beyond a reasonable doubt could be predicated. And our judgment of the cold legal question on the basis of the printed record as to the quantum of evidence adduced in regard to defendant's mental condition at

the time of the offense reinforces the impression formed at the time of trial. That impression was formulated as we listened to Dr. Keith testify and as we observed him on the stand.

The Government opposition to defendant's motion rests on several grounds. It concedes that "there was evidence of mental illness". It also concedes "that when some evidence of insanity is produced, the presumption of sanity disappears and it is incumbent upon the Government to prove the defendant's sanity beyond a reasonable doubt". Nevertheless, the Government argues that "it does not appear there was sufficient evidence introduced to overcome the presumption of sanity, unless an unknown degree of mental illness on the date of the offense be equated with insanity". In a somewhat similar vein, the Government contends that from "the fact that the staff at the Medical Center concluded defendant was competent to stand trial, it would appear that defendant was not suffering from any severe mental illness at the date of his hearing".

The quantum of mental illness in evidence is undisputed. Dr. Keith's diagnosis of defendant was that he was an "000–x44 paranoid personality" of "almost total withdrawal from interpersonal relationships, (with) an almost total inability to live outside of an institutional setting" whose "recent changes in * * * personality, such as increasing suspiciousness and litigiousness may indicate the beginnings of a more severe personality decomposition". The entire Staff at the Medical Center accepted Dr. Keith's evaluations as those which "could not be significantly improved upon since they represent as accurate a psychiatric description of him as is possible at this time".[7] It also must be remembered that

---

was not flecked with some grays". The problem in this case is much simpler than that presented in Dusky because in that case there was some evidence that could be judicially called black and some that could be judicially called white. In this case however, we have only the problem of whether a jury is to be permitted to

call either black or white that which the witness himself calls gray.

7. The Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association (Fifteenth Printing, July, 1962) defines a "000–x44 Paranoid personality" as "such individu-

it was the Government's motion for an examination under Section 4244 that we sustained. All pre-trial discussion of this case centered upon defendant's mental condition.

The legitimate question in this case is not whether there was "some evidence" of defendant's insanity within the meaning of Davis v. United States, 160 U.S. 469, 486, 16 S.Ct. 353, 40 L. Ed. 499, (1895). We think it obvious that ample evidence of defendant's mental condition was introduced that placed the burden of proof of defendant's sanity at the time of the offense on the Government. And within the conceptional meaning of "burden of proof" is included what Wigmore calls the "risk of non-persuasion", the "duty of producing evidence", and the "duty of going forward with evidence". See Sections 2485 and 2487 of 9 Wigmore on Evidence, 270 et seq. When proof beyond a reasonable doubt is required, regardless of whether that notion can or cannot be logically stated (Cf. § 2497 of 9 Wigmore on Evidence, pp. 316 to 325), the burden resting on the Government is indeed a heavy one. Wigmore states in Section 2501 (9 Wigmore on Evidence, p. 359) that "the accuser's sanity is, by the orthodox view, a part of the case of the *prosecution*; and the bur-

den of proving it, in the sense of the risk of non-persuasion (ante, § 2485) is on the prosecution; the measure of persuasion required being, as in all other elements of a crime, persuasion beyond a reasonable doubt (ante, § 2497); and, as an incident of this view, the general presumption of sanity suffices for the prosecution's duty to produce evidence, and only the duty of producing evidence of insanity is thrown upon the accused". Davis v. United States, supra, is quoted at length to illustrate the orthodox view. And it is with Davis that we must deal.[8] We hold the Government's first ground to be untenable.

The Government's second ground brings into play another principle quite clearly announced and applied in Davis. The Government's second contention is that "if the court feels that there was evidence of insanity sufficient to place the burden of proof upon the government, that evidence was extremely insubstantial and the quantum of evidence necessary for the government to rebut defendant's contention need be correspondingly slight". Actually, the Government adduced no evidence at all. But, as we have indicated, it is entitled to have the record searched to ascertain whether a sufficient quantum of evidence was introduced by

als are characterized by many traits of the schizoid personality, coupled with an exquisite sensitivity in interpersonal relations, and with a conspicuous tendency to utilize a projection mechanism, expressed by suspiciousness, envy, extreme jealously and stubbornness" (page 36). A "schizoid personality" is one "characterized by fundamental disturbances in reality relationships and concept formations, with associated affective, behavioral, and intellectual disturbances, marked by a tendency to retreat from reality, by regressive trends, by bizarre behavior, by disturbances in stream of thought, and by formation of delusions and hallucinations" (page 12). Such a diagnosis is grouped as one of the "Personality Disorders" which are described as "those cases in which the personality utilizes a pattern of action or behavior in its adjustment struggle, rather than symptoms in the mental, somatic, or emotional spheres" (page 13). The significance of "x" is to denote that the disorder is

one of "psychogenic origin or without clearly defined tangible cause or structural change" (page 7).

8. In spite of the open invitation of the Eighth Circuit that the Supreme Court grant certiorari in Dusky v. United States, 8 Cir., 1961, 271 F.2d 385, 401, and the expressions of hope that the Supreme Court change the Davis rule (see Chief Judge Miller's dissenting opinion in McDonald v. United States, D.C.Cir. 1962, 312 F.2d 847, 852, Davis decided in 1895, is still the most recent Supreme Court decision dealing with the problems here involved. While we readily agree that some of the medical and scientific nomenclature of Davis can be said to be quite dated, we are also of the opinion that much of what Davis said in regard to the pleading and proof of insanity is sound and is as applicable for today and tomorrow as it was for the yesterday of 1895.

defendant upon which a jury is to be permitted to base a finding that defendant was sane at the time of the offense.

In this regard the Government candidly admits that the quantum of evidence of sanity "was not great". It argues, however, that the defendant apparently made "appropriate and rational responses to the questions propounded to him at the Section 2255 hearing"; that Dr. Keith testified on cross-examination that he thought defendant might be closer to fabrication than to delusion on the spectrum that spans those extremes; and that the jury had the opportunity to observe defendant's demeanor in court. On these "facts", the Government argues that "it appears that the jury had sufficient basis to reasonably believe that the defendant was sane", and that the Government's evidence "was sufficient to sustain the jury's verdict of guilty".

If Davis v. United States, supra, and its progeny are to be taken to mean anything, we do not believe that the Government's second ground is any more tenable than its first. Davis held that the trial court should be reversed because it instructed the jury that "the burden of proof of the insanity rests with the defendant". That case, however, made clear that the trial judge's charge in regard to the presumption of sanity was erroneous because it permitted the jury to return a verdict of guilty, even though it might have entertained a reasonable doubt as to that defendant's sanity. In explaining the error in the charge, Mr. Justice Harlan said that if "the evidence was in equilibrio as to the accused being sane", the jury was permitted to treat the defendant under the erroneous charge" just as he would be if there were no defense of insanity or if there were an entire absence of proof that he was insane".

Davis specifically held that "[w]e are unable to assent to the doctrine that in a prosecution * * *, the defense being insanity, * * * it is the duty of the jury to convict where the evidence is equally balanced on the issue as to the sanity of the accused". "On the contrary", the Supreme Court continued, "he is entitled to an acquittal of the specific crime charged if upon all the evidence there is reasonable doubt whether he was capable in law of committing crime" (page 484 of 160 U.S., page 356 of 16 S.Ct.) And again, on page 488, of 160 U.S., on page 358 of 16 S.Ct., the Supreme Court held that "the vital question from the time a plea of not guilty is entered * * * is whether upon all the evidence, by whatever side adduced, guilt is established beyond reasonable doubt. If the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offense charged".

Certainly the consensus of the members of the Staff at the Medical Center put the question of whether defendant's action and testimony in connection with the Section 2255 motion were manifestations of his mental illness or calculated falsifications in equilibrio, to use the Latin phrase of Mr. Justice Harlan. Nor do we think it can be fairly said that the meager cross-examination testimony of Dr. Keith even approached an exclusion beyond a reasonable doubt of the hypothesis of insanity that collectively the members of the Staff at the Medical Center could not rule out. Davis, of course, does not definitively rule this case on the facts because in that case the question posed procedurally was the correctness of the trial judge's charge to the jury. The question in this case is whether the trial judge should or should not have let the case go to the jury. The Supreme Court has not ruled the latter question and we must look to decisions in the Court of Appeals.

Dusky v. United States, 8 Cir., 1961, 295 F.2d 743, cert. den. 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536 (1962), involving the second trial of that defendant, is the most recent Eighth Circuit case in which the sufficiency of the evidence question was squarely presented and ruled. The Government relies solely upon

that case and for reasons not clearly apparent to us, upon United States v. Westerhausen, 7 Cir., 1960, 283 F.2d 844. In stating some of the "general considerations" applicable to this not uncomplicated field of law, Judge Blackmun in Dusky noted that "it has been said, too, that the nature and quantum of the evidence which the government must produce to meet its burden * * * varies with the nature and quantum of the evidence indicating mental illness". The Government relies particularly on the language that followed which stated that "[t]hus, it would seem that only slight evidence presented by the defense may be met by a comparatively small amount of evidence presented by the prosecution".

But a glance at the cases cited by Judge Blackmun in support of that statement negates any idea that he intended to announce any more than a "general consideration" applicable to a factual analysis of a particular case. And his detailed analysis and distinction *on the facts* of the decisions of the Tenth, Sixth, and the District of Columbia cases cited and discussed on pages 756 and 757 of 295 F.2d, in which "appellate courts reversed jury convictions on the ground that the prosecution did not sustain its burden of proving sanity beyond a reasonable doubt", supports the conclusion that the Eighth Circuit in the second Dusky case did not intend to announce a rule of decision contrary to the developing body of law in this and other circuits.

The cases relied upon in Dusky to support its language that "only slight evidence presented by the defense may be met by a comparatively small amount of evidence presented by the prosecution" demonstrate that the Eighth Circuit approves and accepts the well established rules of decision applied in those cases. Wright v. United States, 1957,

102 U.S.App.D.C. 36, 250 F.2d 4, the first case there relied upon, held that the testimony of two policemen was not sufficient "[t]o send the case to the jury". The second case relied upon, Hopkins v. United States, 1959, 107 U.S.App.D.C. 126, 275 F.2d 155, dealing "only with the circumstances before us" held that "all the evidence did not permit the trier of the fact to conclude beyond a reasonable doubt that appellant had no mental disease or defect". Again the trial court was reversed with instructions to either sustain defendant's motion for acquittal or to grant a new trial if the Government "advises the District Court, without unreasonable delay, that it can meet its burden of proof".

The third case relied upon, United States v. Westerhausen, 7 Cir., 1960, 283 F.2d 844, is relied upon by the Government in this case. The appeal there was from the District Court's refusal to sustain defendant's motion for acquittal. The Seventh Circuit Court of Appeals reversed because from its "extended review of the record * * * we must conclude that the evidence introduced by the Government is not sufficient to sustain the conviction". That case was remanded with instructions "to enter an order granting appellant's motion for acquittal", the Court noting that "[n]o good purpose could be served in ordering a new trial".

There are a host of other cases to which reference could be made in which other trial courts were reversed because of their refusal to sustain motions for acquittal in cases similar to this case. We cite them in footnote 9 below.[9]

In none of the cases relied upon in Dusky and in none of those cited in footnote 9 was the Government's evidence as weak as it was in this case. In this case, the Government made no effort

9. Douglas v. United States, 1956, 99 U.S. App.D.C. 232, 239 F.2d 52; Fielding v. United States, 1957, 102 U.S.App.D.C. 167, 251 F.2d 878; McKenzie v. United States, 10th Cir., 1959, 266 F.2d 524; Satterwhite v. United States, 1959, 105

U.S.App.D.C. 398, 267 F.2d 675; Pollard v. United States, 6th Cir., 282 F.2d 450; Fitts v. United States, 10th Cir., 1960, 284 F.2d 108; Isaac v. United States, 1960, 109 U.S.App.D.C. 34, 284 F.2d 168.

whatever to adduce evidence, either directly or by way of cross-examination of Dr. Keith, that would even tend to prove that the defendant was mentally competent during the Section 2255 hearing. Seemingly at the trial, the Government was attempting to rely upon the non-existent presumption of sanity.

██ If the risk of failing to carry the burden of proving defendant's sanity beyond a reasonable doubt is to be held to have any meaning at all, it is difficult to see how a trial court can do anything except set aside a verdict rendered by a jury to whom the Government adduced no substantial evidence on the particular issue of sanity at the time of the offense. We recognize, as stated in Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 239 F.2d 52, 57, that our duty to set aside a verdict is one to be "performed with caution * * * because of the deference due to the jury in resolving factual issues"; but we also recognize that unless we exercise that power in this case, we would permit a verdict to stand that cannot be said to rest upon any substantial evidence.

We need not notice in any detail the Government's twice mentioned argument that we "gave an instruction to the jury with regard to the defense of insanity that went beyond the instructions required in the Eighth Circuit", and that therefore "the defendant had the benefit of instructions even more favorable to his position than strictly required". It is true that, consistent with what was said in Dusky on page 759 of 295 F.2d, we rejected both the Durham and M'Naghton rules of decision and patterned our charge on what was said in Dusky and on the tests set forth in the Model Penal Code (Proposed Official Draft of the American Law Institute, May 4, 1962), and in United States v. Currens, 3rd Cir., 1961, 290 F.2d 751. We did so because we believed anything less would not give the defendant that which the law presently requires. We do not think we gave the defendant anything more.

The Government's failure to object either when the charge was read in chambers before it was given, or after it was given to the jury makes it most doubtful whether, under Rule 30 of the Rules of Criminal Procedure, the question is now open. For whatever effect it may have on the Government's right to have our charge reviewed in the Court of Appeals, we have reviewed our charge and again rule that it is in accord with the law as we understand it.

The question remains as to whether our order setting aside the verdict shall order a new trial or enter judgment of acquittal. Rule 29 of the Rules of Criminal Procedure confers power to do either. The Government suggests in its brief that if we should determine that its evidence was insufficient to support the verdict "the court should not direct a verdict of acquittal but should order a new trial to enable the government to present further evidence with regard to defendant's sanity".

In connection with this point, the Government relies on Fielding v. United States, 1957, 102 U.S.App.D.C. 167, 251 F.2d 878. Fielding states the rule of decision of the Court of Appeals of the District of Columbia. We are doubtful whether too much reliance should be placed on that rule. The District of Columbia cases are obviously influenced by the existence of the detailed provisions of the District of Columbia Code applicable to mental illness. See, for example, Blunt v. United States, 1957, 100 U.S.App.D.C. 266, 244 F.2d 355, footnote 28 on page 367; Carter v. United States, 1957, 102 U.S.App.D.C. 227, 252 F.2d 608, 618; Satterwhite v. United States, 1959, 105 U.S.App.D.C. 398, 267 F.2d 675, 676. And see also the discussion of the not unrelated problem in Lyles v. United States, 1957, 103 U.S.App.D.C. 22, 254 F.2d 725, cert. den. 356 U.S. 961, 78 S.Ct. 997, 2 L. Ed.2d 1067, and McDonald v. United States, D.C.Cir., 1962, 312 F.2d 847.

The other circuit and district courts are divided as to whether the procedure authorized by Section 211 of Title 24, United States Code, is broad enough to be available to any federal court except

one sitting in the District of Columbia.[10] See Currens, supra, (where the conflict is noticed); Pollard v. United States, 6 Cir., 1960, 282 F.2d 450, 464, and on recall of mandate 6 Cir., 285 F.2d 81 (where applicability was clearly held to be present); Byrd v. Pescor, W.D.Mo.1946, 68 F.Supp. 889, 890 (where it is made apparent that another district court had assumed power to be present); Kuczynski v. United States, 7 Cir., 1945, 149 F.2d 478, footnote 2, page 480 (where possible applicability was recognized); and Howard v. United States, 5 Cir., 1956, 229 F.2d 602, page 608 of Judge Rives' dissenting opinion (where possible availability was recognized). But see on the other side of the ledger, Attorney General MacVeagh's 1881 opinion, 17 Op. Atty.Gen. 213 (and compare Attorney General Gregory's 1916 opinion, 30 Op. Atty.Gen. 569, and Attorney General Sargent's 1927 opinion, 35 Op.Atty.Gen. 366); Sauer v. United States, 9 Cir., 1957, 241 F.2d 640, footnote 32, page 651 (where Judge Rives' dissent was questioned); Dixon v. Steele, W.D.Mo.1951, 104 F.Supp. 904, footnote 1, page 907 (where Judge Hill's rejection of applicability is noted); and Pope v. United States, 5 Cir., 1962, 298 F.2d 507 (where doubt as to applicability is expressed). We, of course, do not rule the question concerning 24 U.S.C.A. § 211 but mention it only to illustrate that in the present state of development in this complicated area of the law, the basis of the rules of decision of the Court of Appeals of the District of Columbia must be carefully examined before they are indiscriminately adopted elsewhere. Cf. Dusky v. United States, 8 Cir., 1961, 295 F. 2d 743, 757–758.

Bryan v. United States, 338 U.S. 552, 559, 70 S.Ct. 317, 94 L.Ed. 335 (1949),

definitely held that the "court" referred to in Rule 29 of the Rules of Criminal Procedure is the District Court. That case does not define the factors that a District Court should consider in the exercise of the discretion conferred by that rule. But Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849 (1946), construing the quite similar discretionary power conferred by Rule 50(b) of the Rules of Civil Procedure, does outline some of the applicable considerations.

▮ From my observation of the defendant from the outset of this case, from my knowledge of the evidence and my impressions of the witnesses, I do not think the ends of justice would best be served by automatically allowing the Government another chance unless it is able to make a preliminary showing that it has competent substantial evidence that could be adduced on a second trial that could be said to make a jury issue in regard to the crucial question of whether defendant was sane at the time he gave his Section 2255 testimony.

If such evidence is available, the Government can advise the Court promptly as to the names of its intended witnesses, the nature of their evidence and of its desire for a second trial. When and if that data is presented, we will then determine whether a new trial will be granted. If the Government does not request a new trial and submit the data just mentioned (which we may or may not adjudge to be sufficient to warrant a new trial) within five (5) days of this memorandum and order, then the verdict will be set aside and, pursuant to the power conferred by Rule 29(b) of the Rules of Criminal Procedure, a judgment of acquittal will be entered.

It is so ordered.

10. Section 211, Title 24, United States Code, provides:

"If any person, charged with crime, be found, in the court before which he is so charged, to be an insane person, such court shall certify the same to the Secretary of Health, Education and Welfare, who may order such person to be confined in Saint Elizabeth's Hospital, and, if he not be indigent, he and his estate shall be charged with expenses of his support in the hospital."